**Xavier FERNANDES, Petitioner,**

**v.**

**Edward McELROY, Acting District Director, Immigration and Naturalization Service, New York Office, and Immigration and Naturalization Service, et al., Respondents.**

No. 94 Civ. 7088 (LAP).

United States District Court, S.D. New York.

Feb. 29, 1996.

---

**430**

Charles A. Grutman, New York City, for Xavier Fernandez.

Mary Jo White, United States Attorney, S.D. New York, F. James Loprest, Jr., of counsel, for Edward McElroy.

### *OPINION AND ORDER*

PRESKA, District Judge:

Petitioner Xavier Fernandes ("Fernandes") brings this action by way of a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging a determination by the Board of Immigration Appeals ("BIA") ordering him deported from the

United States. Immediately at stake in this action is Fernandes's application to become a legal resident of the United States, weighed against the pending deportation order from the Immigration and Naturalization Services ("INS"). Of no small importance to Fernandes, this petition also raises questions of broader significance, potentially affecting numerous, similarly situated persons.

For the reasons set forth below, the petition is granted.[1]

## BACKGROUND

A proper review of this petition can only be made in the complicated context of two related federal actions, each of which successfully challenged INS enforcement of a program created by Congress to legalize qualified illegal aliens. Although complicated, the facts and context of this case are not a source of contention. It is in how to apply the law to the novel circumstances that the parties disagree.

### I. IRCA and the California Cases

#### A. The Immigration Reform and Control Act

On November 6, 1986, as an amendment to the Immigration and Nationality Act of 1952 and in response to the mounting social, legal, and economic pressures cased by the huge influx of immigrants illegally residing and working in the United States, the Immigration Reform and Control Act of 1986, Pub.L. 99–603, 100 Stat. 3359 *et seq.*, ("IRCA"), was signed into law. IRCA primarily addressed this problem along two fronts: (1) reducing the incentive for illegal immigration by penalizing employers who hired undocumented aliens, and (2) offering amnesty to long-term

illegal aliens who demonstrate a capacity to be productive members of society.[2] See H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 52, *reprinted in* 1986 U.S.Code Cong. & Admin.News, 5649, 5656.

The only aspect of IRCA at issue here is a provision in Title II which creates a one-time alien legalization program. 8 U.S.C. § 1255a.[3] In the first stage of this amnesty program, eligible aliens had one year to apply for status as temporary legal residents. 8 U.S.C. § 1255a(a)(1) (1988). In the second stage, to commence 19 months after receipt of temporary status, aliens have two years in which to apply for permanent resident status. 8 U.S.C. § 1255a(b)(1)(A) & (2)(C) (1988 and 1995 Annual Pocket Part).

To be eligible, an applicant had to show both: (1) "that he had resided continuously in the United States in an unlawful status" since January 1, 1982 (the "continuous unlawful residence" requirement), 8 U.S.C. § 1255a(a)(2)(A); and (2) "that [he] has been continually physically present in the United States" since November 6, 1986 (the "continuous physical presence" requirement). 8 U.S.C. § 1255a(a)(3)(A). Under the latter provision, an applicant who left the United States at any time after IRCA was enacted would be ineligible for amnesty. To "mitigate this requirement," *Reno v. Catholic Social Services*, 509 U.S. 43, 47, 113 S.Ct. 2485, 2490, 125 L.Ed.2d 38 (1993), IRCA created a safe harbor for "brief, casual, and innocent absences from the United States." 8 U.S.C. § 1255a(a)(3)(B). Section 1255a(a)(3)(B) provides that an alien who has made a "brief, casual, and innocent" absence from the United States "shall not be considered to have

1. Fernandes is not currently in custody, the government having agreed in September of 1994 to a stay of deportation pending these proceedings.

2. This two-front approach reflects the competing policy concerns which shaped the amnesty program, including: a desire to exclude undocumented aliens who were adversely impacting labor and the U.S. economy; recognition that a failure to adequately enforce existing immigration laws had contributed to the problem; appreciation for the contributions made by undocumented aliens; and an acknowledgement that intensifying interior enforcement or engaging in mass deportations would be "costly, ineffective,

and inconsistent with our immigrant heritage." H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 52, *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5653, 5656 (*discussed in Perales v. Thornburgh*, 967 F.2d 798, 812–13 (2d Cir.1992)).

3. Section 201(a)(1) of IRCA, 100 Stat. 3394–3404, created the legalization program by adding § 245A to the Immigration and Nationality Act of 1952, 66 Stat. 163, as amended, 8 U.S.C. § 1101, *et seq.* Section 201(a)(1) is codified at 8 U.S.C. § 1255a. References herein will be made to the codified sections of the U.S.C.

failed to maintain continuous physical presence."

A second pair of prerequisites required the applicant to be otherwise admissible as an immigrant, 8 U.S.C. § 1255a(a)(4), and to have applied within the 12–month period Congress allotted to the program, the dates for which were to be set by the Attorney General. 8 U.S.C. § 1255a(a)(1)(A). The Attorney General began the program on May 5, 1987, which fixed the closing date on May 4, 1988. See 8 C.F.R. 245a.2(a)(1) (1992).

As the administrative agency entrusted with enforcing IRCA, see 8 U.S.C. § 1255a(g)(1)(B), the INS responded to its enactment by promulgating certain interpretive and enforcement regulations. Two of these regulations were challenged in separate California class actions, giving rise to the litigation which provides much of the context for the present petition.

## B. The *CSS* Class

The first challenge was made against the INS's interpretation and administration of IRCA's "continuous physical presence" requirement and the "brief, casual, and innocent" exception. In a nationwide telex sent to its regional offices on November 14, 1986, less than a week after IRCA became effective, the INS narrowly interpreted the "brief, casual, and innocent" exception. According to this interpretation, a trip outside the United States would be considered "brief, casual, and innocent" only if the INS had previously approved the trip.[4] Aliens who did not receive "advance parole" would be ineligible for legalization—and detained at the border and subject to deportation proceedings when they attempted to reenter the United States. See 8 C.F.R. § 245a.1(g).

In an action commenced in the Eastern District of California on November 24, 1986, the INS's interpretation and enforcement of 8 U.S.C. § 1255a(a)(3)(B) was challenged.

See *Catholic Social Services, Inc. v. Meese,* 685 F.Supp. 1149 (E.D.Cal.1988). In a May of 1988, the district court issued two orders. One order certified the plaintiffs as a class (the "CSS class"), comprised of:

persons *prima facie* eligible for legalization under INA § 245A [8 U.S.C. § 1255a] who departed and reentered the United States without INS authorization (i.e., "advance parole") after the enactment of IRCA following what they assert to have been a brief, casual and innocent absence from the United States.

See *Catholic Social Services, Inc. v. Thornburgh,* 956 F.2d 914, 917 (9th Cir.1992) (quoting the district court's May 3, 1988 order). The second order invalidated the INS's interpretation of the "brief, casual, and innocent" exception and enjoined its enforcement. See *CSS v. Meese,* 685 F.Supp. at 1159–60.

The district court found that the INS's advance parole restriction created an obstacle that Congress did not intend and was therefore inconsistent with the "brief, casual and innocent" exception of 8 U.S.C. § 1255a(a)(3)(B) and contrary to the purpose of IRCA. *Id.* at 1152. After weighing the plain meaning of "brief, casual, and innocent" and the legislative history of IRCA against the challenged rule, the court held that an otherwise permissible absence would not render an alien ineligible for legalization simply because the absence was not pre-approved by the INS. *Id.* at 1159. As discussed further below, the court found support for its conclusion in the express intent of Congress that IRCA's amnesty program was to be liberally construed.

The Committee intends that the legalization program should be implemented in a liberal and generous fashion, as has been the historical pattern with other forms of administrative relief granted by Congress. Such implementation is necessary to insure the true resolution of the problem and to

---

4. The November 14th telex provided that "[a]n alien who makes an unauthorized departure and illegal reentry after [November 6, 1986] shall be considered to have broken his period of continuous physical presence and thus will be ineligible for legalization under Section 245(a)." *CSS v. Meese,* 685 F.Supp. 1149, 1157 (E.D.Cal.1988).

In regulations issued on May 1, 1987, the INS amended its November 14th directive, ruling that only unapproved absences after May 1st would interrupt the continuous presence requirement and trigger ineligibility. See 8 C.F.R. § 245a.1(g).

insure that the program will be a one-time-only program.

H.R.Rep. No. 682(I) at 72, 1986 U.S.Code Cong. & Admin.News at 5676, *quoted in CSS v. Meese,* 685 F.Supp. at 1155.

### C. The *LULAC* Class

The second challenge was brought against the INS's interpretation of 8 U.S.C. § 1255a(a)(2)(A), IRCA's continuous unlawful residence requirement. In August of 1987, the INS issued a regulation declaring ineligible for legalization any alien who had left the United States and attempted to reenter using documentation that was "facially valid" but actually fraudulent.[5] See 8 C.F.R. § 245a.2(b)(8) (1992). In October, before any court action had been taken, the INS retreated from its original interpretation, recognizing the eligibility of aliens returning as "nonimmigrants" to an "unrelinquished unlawful residence," and allowing that reentry with documentation that was valid only on its face would not result in ineligibility, provided the alien applied for a waiver excusing the fraud. See 8 C.F.R. §§ 245a.2(b)(9) & (10). Nevertheless, after a suit was filed in July of 1987 in the Central District of California, plaintiff amended its complaint and sought a declaratory judgement that the original reentry requirement was inconsistent with IRCA and in violation of the Equal Protection Clause. *See League of United Latin American Citizens v. INS,* No. 87–4757–WDK (JRX) (C.D.Cal. July 15, 1988). A class (the "*LULAC* class") was again certified, consisting of:

> all persons who qualify for legalization but who were deemed ineligible for legalization under the original policy, who learned of their ineligibility following promulgation of the policy and who, relying upon information that they were ineligible, did not apply for legalization before the May 4, 1988 deadline.

*Id.*

The district court, by order dated July 15th, invalidated the original unlawful reentry restriction.

### D. *CSS* and *LULAC* on Appeal

In neither *CSS* nor *LULAC* did the government appeal the certification of the class or, more importantly, the invalidation of the challenged rules. *See CSS v. Thornburgh,* 956 F.2d at 917. The government did appeal both the jurisdiction of the courts and their subsequent remedial orders, particularly the extension of the amnesty program deadline from May 4, 1988 to November 30, 1988. *See CSS v. INS,* No. S–86–1343 LKK (E.D.Cal. June 10, 1988); *LULAC v. INS,* No. 87–4757 WDK (JRX) (C.D.Cal. Aug. 12, 1989), 1989 WL 252578 (C.D.Cal.1989).

In *CSS v. Thornburgh, supra,* the Ninth Circuit consolidated the appeals. After waiting for the Supreme Court's decision in *McNary v. Haitian Refugee Ctr., Inc.,* 498 U.S. 479, 496, 111 S.Ct. 888, 898, 112 L.Ed.2d 1005 (1991) (restating "the well-settled presumption favoring interpretations of statutes that allow review of administrative action"), the appeals court rendered its decision in February of 1992, affirming both the subject matter jurisdiction of the district courts and their extension of legalization program deadline. As to jurisdiction, the judicial review provision of Title II of IRCA was found not to preclude the trial courts' action. *See CSS v. Thornburgh,* 956 F.2d at 919–921 (discussing judicial review under IRCA, 8 U.S.C. § 1255a(f)). As to the extensions, the court held that the INS's invalidated regulations had the effect, contrary to the intent of Congress, of truncating the program's one-year lifetime and undermining its goals, and that it was not beyond the district courts' equitable powers to extend its deadline. *See id.* at 922 (extending the deadline for those denied the full twelve-month period "effectuates, rather than frustrates, the public policy established by Congress").

The Supreme Court granted certiorari on two questions: (1) whether the district courts

---

**5.** Attempting to explain this quirky rule, the Ninth Circuit Court of Appeals wrote, "[t]he INS apparently reasoned that the reentry by use of a fraudulent but facially valid immigration document was constructively lawful and therefore interrupted the continuous unlawful residency requirement." *CSS v. Thornburgh,* 956 F.2d at

918. As the Supreme Court noted, this provision had the presumably unintended effect of favoring aliens who avoided inspection points when reentering the United States, crossing instead at "a desolate portion of the border." *Reno v. CSS,* 509 U.S. at —–—— n. 8, 113 S.Ct. at 2491–92 n. 8.

had jurisdiction, and (2) whether they properly extended the amnesty application deadline. *See Barr v. Catholic Social Services, Inc.*, 505 U.S. 1203, 112 S.Ct. 2990, 120 L.Ed.2d 867 (1992). Relying on *McNary*, the Court held that the preclusion of district court review provided for in IRCA " 'applies only to review of denials of *individual . . .* applications.' " *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, ——, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38 (1993) (*quoting McNary*, 498 U.S. at 494, 111 S.Ct. at 897) (emphasis added). Section 1255a(f) does not preclude review when, as with the *CSS* and *LULAC* classes, "an action challeng[es] the legality of a regulation without referring to or relying on the denial of any individual application." *Id.* at ——, 113 S.Ct. at 2495.

Rather than reaching the second question, however, the Court vacated and remanded on ripeness grounds, finding that the matter was non-justiciable in the absence of a showing of "concrete injury." *See id.* (discussing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). INS promulgation of the invalidated regulations did not itself satisfy the concrete injury requirement, because the regulations

> impose no penalties for violating any newly imposed restriction, but limit access to a benefit created by [IRCA] but not automatically bestowed on eligible aliens. Rather, [IRCA] requires each alien desiring the benefit to take further affirmative steps, and to satisfy criteria beyond those addressed by the disputed regulations.

*See id.* at ——, 113 S.Ct. at 2496 (footnote omitted). Because *CSS* and *LULAC* challenged the INS interpretation of only two of the several statutory prerequisites for amnesty, a class member's claim "would ripen only once he took the affirmative steps that he could take before the INS blocked his path by applying the [challenged] regulation to him." *Id.* None of the class members had offered evidence to show that enforcement of the challenged regulations, as opposed to some other statutory requirement, had caused that alien to be declared ineligible. *Id.* at ——————, 113 S.Ct. at 2498–99. The Supreme Court therefore remanded for further findings of fact on that issue.

## II. Petitioner Fernandes's Administrative Proceedings

Petitioner Fernandes is a 44–year–old citizen of India residing in the United States. (Petition for Writ of Habeas Corpus ("Petition"), ¶ 1). He is a candidate for legalization under IRCA's amnesty program, having applied for lawful temporary resident status in Atlanta on December 21, 1989. See September 27, 1993 Order of the Immigration Judge ("IJ Order") at p. 2. He is also a member of the *LULAC* class. (Petition, ¶ 4).

In May of 1992, Fernandes left the United States to return temporarily to India, to care for, and oversee the financial affairs of, a brother suffering from throat cancer. (Affidavit of Xavier Fernandes, sworn to September 29, 1994, ("Fernandes Aff."), ¶ 2). He applied to the INS for prior approval for this trip, but was denied advance parole. (Fernandes Aff., ¶ 4). On July 27, 1992, when Fernandes returned to the United States, he was detained by immigration officials at John F. Kennedy International Airport in New York and placed in exclusion proceedings. (Fernandes Aff., ¶ 5).

The initial proceedings occurred over the course of several hearings in front of Immigration Judge Sabri Kandah (the "IJ"). The exclusion hearings began on October 21, 1992, were adjourned pending the outcome of *Reno v. CSS*, recommenced on May 4, 1993, and concluded on December 21, 1993. At the final hearing, Fernandes was ordered excluded from the United States. Four recurrent points stand out from the exclusion hearings transcript as the bases for this determination. First, Fernandes was an applicant for legalization under IRCA. (Exclusion Hearings Transcript ("EH") at p. 4–5, 12). Second, Fernandes was a *LULAC* class member, not a *CSS* member. (EH at p. 12). Third, Fernandes did not proffer valid papers upon his arrival (or anytime thereafter) which showed that he was entitled to enter the United States. (EH at p. 13). Fourth, ruling that such matters were the exclusive jurisdiction of the Legalization Unit of the INS, the IJ refused to hear argument as to the reasons why Fernandes had been absent from the United States or as to the merits of

his application for amnesty. (EH at pp. 13–14).

The deportation order held that Fernandes, as an applicant who had not obtained advance parole under 8 C.F.R. § 245a.2(m)(1), and who had returned seeking admission with only an expired employment authorization card,[6] was properly placed in exclusion proceedings. See IJ Order at p. 2. And since Fernandes had not, over the course of the hearing, met an alien's burden of proof of showing that he was not inadmissible by producing a valid and unexpired immigrant visa, his application for legalization was denied and he was ordered excluded and deported pursuant to § 212(a)(7)(A)(i)(I) of IRCA, codified at 8 U.S.C. § 1182(a)(7)(A)(i)(I). See id. at p. 3.

The BIA dismissed Fernandes's appeal. The BIA noted that he was an applicant for legalization, but had not received advance parole under 8 C.F.R. § 245a.2(m)(1). The BIA then discussed the *CSS* injunction against enforcement of the advance parole requirement against *CSS* class members, stressing that the injunction did not apply to *LULAC* class members such as petitioner. Because he was not entitled to *CSS* class protection against the advance parole regulation, because he was unable to produce valid entry documentation to prove admissibility under the "basic rules of exclusion and entry," and because "neither [IRCA] nor federal regulations contain a provision for the termination of expulsion proceedings pending the adjudication of an application for temporary resident status,"[7] Fernandes was found excludable as charged. BIA Order of April 25, 1994 at p. 2. He then commenced the present action, seeking review.

This court has jurisdiction to hear this petition for review of the BIA's decision under 8 U.S.C. § 1105a(a) & (b) (1970 & 1995 Annual Pocket Part) and, alternatively, 8 U.S.C. § 1255a(f)(4)(A).

## STANDARD OF REVIEW

■ Findings of fact by the BIA are conclusive and will not be disturbed on judicial review "if supported by reasonable, substantial, and probative evidence on the record, considered as a whole." 8 U.S.C. § 1105a(a)(4); *Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994); *Maikovskis v. INS*, 773 F.2d 435, 446 (2d Cir.1985), *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2915, 91 L.Ed.2d 544 (1986). Only if "a reasonable fact-finder would have to conclude" otherwise will BIA findings of fact be reversed. *INS v. Elias-Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 815, 117 L.Ed.2d 38 (1992).

■ Judicial review of BIA interpretations of law is more restrained. *See Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977). Courts owe significant deference to an administrative agency's interpretations of statutory law. *See Weeks v. Quinlan*, 838 F.2d 41, 43 (2d Cir.1988); Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* This is particularly true in the realm of immigration law. *See Reno v. Flores*, 507 U.S. 292, 305–07, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993). When an administrative agency's construction of a statute is challenged, a reviewing court must first decide if Congress has spoken directly to the issue at hand and Congressional intent is clear. If so, the agency must give effect to that intent. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984) ("If the intent of Congress is clear, that is the end of the matter, for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (*quoted in INS v. Cardoza-Fonseca*, 480 U.S. 421, 446, 107 S.Ct. 1207,

---

**6.** As part of IRCA's amnesty program, the INS was required to provide "an alien who presents a prima facie application for adjustment of status" with "an 'employment authorized' endorsement or other appropriate work permit." 8 U.S.C. § 1255a(e)(2)(B).

**7.** The BIA's pronouncement on this third point seems to contradict IRCA, which provides:

[t]he Attorney General shall provide that in the case of an alien who presents a prima facie application for adjustment of status … during the application period, and until a final determination of the application has been made in accordance with this section, the alien—
(A) shall not be deported.

8 U.S.C. § 1255a(e)(2)(A). A similar provision applies to pre-applicants. 8 U.S.C. § 1255a(e)(1)(A).

1221, 94 L.Ed.2d 434 (1987)). If Congress has not directly spoken, and drafted a statute that is "silent or ambiguous with respect to the specific issue," the question for the reviewing court "is whether the agency's answer is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782. Although "the judiciary is the final authority on issues of statutory construction," *id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9, a court "cannot simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Id.* Regulations will not be upheld if they are unreasonable, arbitrary, capricious, or manifestly contrary to the statute. *See id.* at 843–44, 104 S.Ct. at 2782; *Cardoza–Fonseca*, 480 U.S. at 446–48, 107 S.Ct. at 1221, 94 L.Ed.2d 434 (1987); *Osorio*, 18 F.3d at 1022; *Michael v. Slattery*, 852 F.Supp. 211, 216 (S.D.N.Y.1994); 8 U.S.C. § 1255a(f)(4)(B) (administrative findings of fact and determinations conclusive absent abuse of discretion or clear and convincing contradictions of record); *Ruginski v. INS*, 942 F.2d 13, 17 (1st Cir.1991) (upholding as "not unreasonable nor contrary to the evidence on the record" Legalization Unit's rejection, affirmed by BIA, of amnesty application for failure to meet IRCA's continuous unlawful residence requirement).

## DISCUSSION

The BIA's determination is clearly unreasonable. It relies on an arbitrary distinction propped up by a congested maze of immigration regulations which distort and contravene the Congressional intent behind the very act which they are meant to implement. For purposes of this petition, the distinction between the *LULAC* and *CSS* classes insisted upon by the IJ and BIA is an artificial convenience which is entirely contrary to the clear language and intent of IRCA.

Although the INS itself, put on notice by *CSS*, revoked its interpretation of "brief, innocent, and casual" as to that class in May of 1993, the government now seeks to get additional mileage out of an invalidated regula-

tion when it argues that Fernandes is excludable because, as a *LULAC* class member, he failed to get advance parole before leaving for India. As discussed below, I agree with petitioner that there is no rational reason for treating *LULAC* class members any differently from *CSS* class members in respect to "brief, casual, and innocent" absences and eligibility for amnesty.

### I. The Advance Parole Requirement

█ To be eligible for IRCA's legalization program, an applicant must meet the four criteria discussed above. See 8 U.S.C. §§ 1255a(a)(1)–(4). The critical criterion here is the "continuous physical presence requirement" of § 1255a(a)(3)(A). Congress intentionally softened this requirement when it allowed that "brief, casual, and innocent" absences would not, for purposes of eligibility for legalization, interrupt an alien's continuous physical presence in the United States. See 8 U.S.C. § 1255a(a)(3)(B).[8] The INS, however, overreached its authority to implement IRCA and the legalization program when it said an absence can only be "brief, casual, and innocent" if it received prior INS approval. The advance parole rule was challenged by the *CSS* class and struck down in an order from Judge Karlton issued on May 3, 1988 (the "May 1988 *CSS* Order"). Judge Karlton's thorough reasoning, which I adopt here, lays bare the INS's unjustifiably stringent, unlawful interpretation of "brief, casual, and innocent."

█ First, the May 1988 *CSS* Order notes that "[t]he task for a court confronted with a challenge to an administrative agency's construction of a statute is to ascertain congressional intent, for it is the duty of both the court and the agency to give effect to that intent. *INS v. Cardoza–Fonseca*, 480 U.S. 421, [445] n. 29 [107 S.Ct. 1207, 1220 n. 29, 94 L.Ed.2d 434] (1987) [quoting *Chevron* at length]." *CSS*, 685 F.Supp. at 1152. *CSS* enunciates and applies each step of that task. First, in the absence of binding authority construing the statute, a court employs the plain meaning rule, and then, if necessary,

---

**8.** Section 1255a(a)(3)(B) reads: "[a]n alien shall not be considered to have failed to maintain continuous physical presence in the United States for purposes of [8 U.S.C. § 1255a(a)(3)(A)] by virtue of brief, casual, and innocent absences from the United States."

looks to legislative history. *Id.* (citation omitted). If these "traditional tools of statutory construction" reveal congressional intent, the court must determine if the agency's rule is "fully consistent" with that intent. *Id.* (citation omitted). If, however, these tools of inquiry reveal only silence or ambiguity as to Congress's intent, then the court must resort first to textual aids and secondly to extrinsic aids, including examining the agency's interpretation. *Id.* If ambiguity exists, the administrative interpretation will be deferred to provided it is a "linguistically possible one and is consistent with the statutory purpose," *id.* (quoting *Young v. Community Nutrition Institute,* 476 U.S. 974, 981–82, 106 S.Ct. 2360, 2364–65, 90 L.Ed.2d 959 (1986)), or when "based on permissible construction of the statute." *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782).

Cautiously finding that congressional intent was not clearly manifest in the text or in legislative history, the court proceeded to use extrinsic interpretive aids before declining to defer to the INS rule. Specifically, Judge Karlton found: (1) that Congress, based on a substantial body of case law, knew exactly what it meant by a "brief, casual, and innocent" absence and this meaning did not encompass prior approval;[9] (2) that Congress intended for the legalization program to be "implemented in a liberal and generous fashion;"[10] (3) that the INS's interpretation was not only in conflict with congressional intent and the historical meaning of "brief, casual, and innocent," but inconsistently applied within the statutory scheme;[11] (4) that Congress's sensitivity to the reluctance of undocumented immigrants, already fearful of the INS, to participate in the program made it "highly unlikely that Congress intended to require such aliens to seek INS permission to leave the country prior to the time their legalization applications were filed;"[12] and (5) that "as a practical matter, . . . [the INS interpretation] virtually nullifies the 'brief, casual, and innocent' absence exception to the continuous presence requirement."[13] *CSS v. Meese,* 685 F.Supp at 1153–57.

The regulation invalidated by the May 1988 *CSS* Order was 52 Fed.Reg. 16206, 16208, codified at 8 C.F.R. § 245a.1(g).[14] The impact of the order was to remove the advance parole requirement as an impedi-

9. Congress was clearly aware of the judicial history of "brief, casual, and innocent," including *Rosenberg v. Fleuti,* 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963), and had also used the phrase in modifying the continuous physical presence requirement for purposes of suspension of deportation proceedings in an amendment of the Immigration and Nationality Act which "relaxe[d] the residence requirement." H.R.Rep. No. 682(I), 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5682.

10. "The Committee intends that the legalization program should be implemented in a liberal and generous fashion, as has been the historical pattern with other forms of administrative relief granted by Congress. Such implementation is necessary to insure that the program will be a one-time-only program." H.R.Rep. No. 682(I) at 72, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 5676.

11. The INS had conceded during *CSS* discovery that, as used in 8 U.S.C. § 1244 (suspension of deportation), "brief, casual, and innocent" absences did not necessarily require prior approval. *CSS,* 685 F.Supp. at 1157.

12. Sensitive to undocumented aliens' position, IRCA provides both: (1) "qualified designated entities," essentially buffers between the INS and applicants, to assist with the legalization process and ease the "distrust of authority and lack of understanding among the undocumented population . . . [and] . . . to encourage participation among undocumented aliens who fear coming forward," H.R.Rep. No. 682(I) at 73, *reprinted in* 1986 U.S.Code Cong. & Admin.News at 5677; and (2) confidentiality provisions "meant to assure applicants that the legalization process is serious and not a ruse to invite undocumented aliens to come forward only to be snared by the INS." *Id.*

13. As put by Senator Cranston: "[t]he whole purpose of having a legalization program—to bring some of the presently undocumented workers into the mainstream—is undercut if overly stringent procedures prevent vast numbers of aliens from qualifying and intimidate many others from even applying." 129 Cong.Rec. 12,810 (1993).

14. This section reads:

'Brief, casual, and innocent' means a departure authorized by the Service (advance parole) subsequent to May 1, 1987 of not more than thirty (30) days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control.

ment to eligibility for amnesty. Although it stopped short of defining "brief, casual, and innocent," a matter left for case-by-case adjudication, *see Cardoza–Fonseca*, 480 U.S. at 448, 107 S.Ct. at 1221, the court unambiguously held that "[t]he final regulation defining a 'brief, casual, and innocent' absence as one authorized by the INS is invalid as inconsistent with the statutory scheme and is hence unenforceable." *Id.* at 1160.

Somehow, the May 1988 *CSS* Order did not signal the end of the day for advance parole, which had found its way into other INS regulations promulgated under IRCA.[15] This led to another persuasive order from Judge Karlton (the "April 1993 *CSS* Order"), invalidating the directive of a January 6, 1992 INS Central Office Telex. The telex instructed that:

[a] legalization applicant is not allowed to travel outside the United States without advance parole authorization. Any such applicant, including an applicant who has attained class membership under CSS ... must present ... authorization for parole of an alien into the United States, in order to be paroled into the United States. Aliens who maintain that they have filed but have not yet received work authorization have established no right to any benefit, and may not reenter the United States based upon such a claim.

No legalization litigation applicant seeking entry without an advance parole authorization shall be paroled into the United States....

January 6, 1992 INS Central Office Telex, *quoted in* the April 1993 CSS Order at p. 2. Just as the May 1988 *CSS* Order had done for pre-applicant aliens, the April 1993 *CSS* Order struck down the advance parole requirement for aliens who had already applied to the legalization program before temporarily leaving the United States. In terms that ring true for Fernandes, the court described the problem this way:

Plaintiffs seek relief from the policy prohibiting class members from leaving the country for [a] brief period of time without advance parole. If a class member leaves

the country without advance parole, that member will be barred from re-entering the United States. Plaintiffs provide evidence of legalization applicants who have left the country for a brief time for family emergencies and who have been barred or detained upon re-entry.

April 1993 *CSS* Order at p. 3–4.

Notwithstanding the May 1988 *CSS* Order, the INS argued that it could require advance parole authorization as a prerequisite to the "brief, casual, and innocent" exception. It relied for this argument on 8 U.S.C. § 1255a(a)(3)(C), which provides that "[n]othing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this section." Judge Karlton rejected this argument as inapposite. *CSS* class members, who had already applied to the legalization program for an adjustment of status, and who thereafter sought re-entry into the United States after a "brief, casual, and innocent" absence, were neither applying for admission nor being admitted for adjustment of status—they had already done so. See April 1993 *CSS* Order at p. 6. The government having "provide[d] no other justification for distinguishing between brief, casual or innocent absences by general applicants and plaintiff class members," *id.*, the court ordered that

any subclass 1 members held in detention solely on the basis that they departed from the United States without advance parole shall be immediately released from detention if their absence was otherwise "brief, casual, and innocent."

*Id.* at 7.

Responding to this order, the INS issued a directive on May 25, 1993, quickly acknowledging that "the term 'brief, casual, and innocent' is to be given the 'historic' definition that has evolved through administrative and judicial law, and determinations are to be made on a 'case-by-case basis.'" INS Directive, dated May 25, 1993, at p. 2. The directive instructed that "any exclusion pro-

---

**15.** The advance parole requirement has appeared in, at least, the November 14, 1986 and January 6, 1992 telexes, and in 8 C.F.R. §§ 245a.1(g) and 245a.2(m)(1).

ceedings against a *CSS* class member which were commenced solely because the alien sought admission without advance parole are to be terminated.... Any CSS class member held in detention pending exclusion proceedings that began solely because the alien sought admission without advance parole is to be released." *Id.* at 4–5.

## II. The Government's Current Argument

Taking a third bite at the apple, and drawing directly from the IJ and BIA determinations, the government now offers a deceptively simple two-step argument against Fernandes's petition. First, Fernandes failed to obtain advance parole for his trip to India, as required by 8 C.F.R. § 245a.2(m)(1).[16] Second, because he failed to obtain advance parole, he was properly treated upon his return as an undocumented alien, under 8 U.S.C. § 1182(a)(7)(A)(i)(I).[17] Since this section requires aliens to prove their admissibility by producing the proper documentation, and since Fernandes was able to produce only an expired work authorization card, he was properly placed in exclusion proceedings. When he was unable at these proceedings to produce satisfactory documentation, he was ordered excluded.

This argument ignores the reality of Fernandes's situation and the language and purposes of IRCA, as well as the import of the *CSS* orders and the INS's own retreat from the advance parole rule. I will not punish the petitioner for failing to follow the mandate of a twice-invalidated INS regulation, and that agency's willingness to do so strains one's faith in its aptitude for implementing the will of Congress and respecting the rule of law.

First, I reiterate, for the reasons set forth in *CSS* and in *De Oliveira v. INS,* 873 F.Supp. 338 (C.D.Cal.1994), discussed below, that I find the advance parole requirement to be contrary to the will of Congress as expressed in IRCA and therefore to be invalid. Grafting the advance parole rule onto the "brief, casual, and innocent" exception serves an administrative agenda at the expense of congressional intent, causing in the process a substantial and unjustified subrogation of the amnesty program. Nothing in the text of the statute, its legislative history, its clearly stated goals, or in any extrinsic interpretive aids, including the inconsistent and apparently arbitrary interpretation of the INS itself, justifies the promulgation and enforcement of the advance parole rule. By defining a "brief, casual, and innocent" absence as one which it authorizes, the INS has substituted its judgment for Congress's; the advance parole requirement—whether applied to the *CSS* or *LULAC* class—is nothing more than an end-run around legislative intent, by which the INS reserved for itself, disdaining the statutory scheme, the power to determine which absences were "brief, casual, and innocent" and which were not, and thereby who was entitled to amnesty and who was not. In doing so, it has acted in an unreasonable and arbitrary manner.

Second, I note for the sake of thoroughness that this is not the first time a court in the Second Circuit has invalidated an INS rule promulgated under IRCA. In *Perales v. Thornburgh,* 967 F.2d 798 (2d Cir.1992), *vacated for other reasons sub nom., Reno v. Perales,* 509 U.S. 917, 113 S.Ct. 3027, 125 L.Ed.2d 716 (1993), the Court of Appeals

---

16. Section 245a.2 covers "Application for Temporary Residence." Section 245a.2(m)(1) reads:
 During the time period from the date that an alien's application establishing prima facie eligibility for temporary resident status is reviewed at a Service Legalization Office and the date status as a temporary resident is granted, the alien applicant can only be readmitted to the United States provided his or her departure was authorized under the Service's advance parole provisions contained in § 212.5(e) of this chapter.
 Section 212.5 covers "Parole of Aliens into the United States." Section 212.5(e) reads: "Advance authorization. When parole is authorized

for an alien who will travel to the United States without a visa, the alien shall be issued Form I–512."

17. Except as otherwise provided in this chapter, any immigrant as the time of application for admission—
 (1) who is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing identification card, or other valid entry document required by this chapter, and a valid unexpired passport, or other suitable travel document ...
 ... is excludable.
 8 U.S.C. § 1182(a)(7)(A)(i)(I).

struck down an INS regulation concerning IRCA's "public charge" exception to eligibility.[18] Similar to *CSS* and *LULAC*, the *Perales* plaintiffs charged that the INS had promulgated rules that unlawfully deprived them of IRCA's promise of amnesty. Essentially, the INS had broadly expanded the scope of inquiry into whether an alien applicant was in danger of becoming a public charge, and therefore ineligible. Whereas Congress had limited its concern to whether "the alien demonstrates a history of employment in the United States evidencing self-support without receipt of public cash assistance," 8 U.S.C. § 1255a(d)(2)(B)(iii), the INS broadened the inquiry to consider whether not only the alien but the alien's family had received any public assistance, see 8 C.F.R. § 245a.1(i) (1992), and whether the alien demonstrated the ability to support his or her family. See 8 C.F.R. § 245a.2(k)(4) (1994). Reviewing the INS's subsequent amendments and clarifications of the challenged rules and noting that the courts do not owe deference to an agency's construction when the text of the statute clearly establishes a contrary congressional intent, the Court of Appeals found that the challenged rules contravened IRCA. *See Perales*, 967 F.2d at 809–10.[19]

From *CSS* to *LULAC* to *Perales*, the INS's track record in enforcing IRCA has been dismal. In each case, a significant INS rule was struck down by the courts. In each case, before final judgment was rendered, the INS confessed to its poor judgment by issuing new rules, directives, or clarifications to correct or amend its flawed interpretations. *Cf. Cardoza–Fonseca*, 480 U.S. at 446 n. 30, 107 S.Ct. at 1221 n. 30 ("An additional reason for rejecting the INS's request for heightened deference to its position is the inconsistency of the positions the BIA has

taken through the years. An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is 'entitled to considerably less deference' than a consistently held agency view.") (citations omitted). In each instance, the INS had simply "added its own requirement to those Congress has established for eligibility for immigrants to obtain legal status." *Perales v. Reno*, 48 F.3d 1305, 1317 (2d Cir. 1995) (Cardamone, J., dissenting). In this dubious light, I share the frustration of Judge Cardamone, who called the INS "a modern-day counterpart to Dickens' 'Circumlocution Office.' ... 'beforehand with all public departments in the art of perceiving— HOW NOT TO DO IT.' " *Perales*, 48 F.3d at 1317. Certainly, the INS's various interpretations of IRCA did nothing to dispel the perception that " 'we historically have told our employees that it's our job to keep [immigrants] out and our job to keep [immigrants] from getting benefits,' " *id.* (quoting Sandhog & Engelberg, "Insider's View of the INS: 'Cold, Rude and Insensitive,' " *N.Y. Times*, September 15, 1994, at A1, A18)—all without regard to the express requirements of the statute.

Fernandes was treated like an undocumented immigrant, rather than an applicant for legalization under IRCA's amnesty program only because he failed—and not for lack of trying—to secure prior approval when none was required by Congress when it designed the program. The incoherence of that outcome, and certainly its unfairness, has taken its toll even on the government, which now finds itself in the embarrassing position of both misrepresenting the law and reversing the central assertion of its original argument.

---

**18.** The class certified in *Perales*, similar in definition to the *CSS* and *LULAC* classes, included:

[a]ll undocumented aliens residing in New York State who may be excludable from the Legalization Program established by IRCA as 'likely to become public charges' under the standards set forth in [the challenged] INS regulations ... based in whole or in part upon the receipt of public cash assistance by the applicant's U.S. citizen or legal permanent resident family members, including but not limit-

ed to those individuals who were deterred from filing applications for legalization under the Legalization Program.
*Perales*, 967 F.2d at 804.

**19.** After deciding *Reno v. CSS*, the Supreme Court vacated and remanded *Perales, see Reno v. Perales*, 509 U.S. 917, 113 S.Ct. 3027, 125 L.Ed.2d 716 (1993), in order "to determine whether plaintiffs' claim challenging the validity of the public charge regulations is ripe." *Perales v. Reno*, 48 F.3d 1305 (2d Cir.1995).

The misrepresentation involves IRCA's amnesty program, about which the government asserts, "[a]uthorization to reenter the United States after travel abroad was not provided for in the statutory scheme." Mem. in Opp. at p. 10. The government then goes on to suggest that it was the INS itself which created the opportunity for departing aliens to reenter the United States, under 8 C.F.R. § 245a.2(m)(1), provided the alien had received prior authorization. Id. at pp. 10–11. This argument forgets the fact that the "brief, casual, and innocent" absence exception is a statutory vehicle, one which implicitly authorizes aliens returning from such absences to be readmitted to the United States without the documentary requirements normally attending reentry. See 8 U.S.C. § 1255a(a)(3)(B). Section 245a.2, after all, was an administrative response to this statutory exception.

The government goes on to argue that although the May 1993 *CSS* Order enjoined the INS from excluding *CSS* class members returning from unapproved "brief, casual, and innocent" absences, it said nothing about *LULAC* members. Thus, there was no judicial displacement of the advance parole requirement for a *LULAC* member such as petitioner. As the government asserts: "[i]n short, in the absence of authority to the contrary, 8 C.F.R. § 245[a].2(m)(1) controls this case." *Id.* at p. 18. Apparently, the argument behind this assertion is that § 245a.2 does not expressly interpret the "brief, casual, and innocent" exception and thus is not invalidated by the May 1988 *CSS* Order; that § 245a.2 requires advance parole; that Fernandes did not obtain advance parole; and that, therefore, he is excludable.

■ In a later submission, which I requested to enable the parties to respond to a pertinent case decided after this petition was fully briefed, *De Oliveira v. INS*, 873 F.Supp. 338 (C.D.Cal.1994), the government abandoned this argument. In its letter-brief on *De Oliveira*, the government states:

[t]he government's statement in its moving papers that 8 C.F.R. § 245.2(m)(1)—and its advance parole requirement for IRCA legalization applicants—"controls" this

case is inadvertently misleading.... Inasmuch [sic] as Fernandes concedes that he did not file a timely application for IRCA legalization, he has clearly not established "prima eligibility [sic] for temporary resident status," and thus, 8 C.F.R. 2[4]5.2(m)(1) does not "control" this case. The holding of the court in *De Oliveira* invalidating 8 C.F.R. § 245a.2(m)(1) ... is, therefore, irrelevant.

Government Letter Brief, dated June 21, 1995, at pp. 2–3 n. 3. I am at a loss to explain this reversal or the ground the government hoped to gain thereby, nor am I clear that the footnote means what it says. First, without the advance parole argument, the primary reason for excluding Fernandes is gone. Section 245a.2(m)(1) provided the primary basis for the IJ and BIA decisions. Second, without the advance parole requirement, the only basis to exclude Fernandes is 8 U.S.C. § 1182(a)(7)(A)(i)(I). It simply ignores the facts of this case, as well as (with the exception of this footnote) the entire focus of the parties' papers, to treat Fernandes as if he were simply an undocumented alien seeking entry into the United States for the first time, with no relevant history, no *LULAC* class membership, no work authorization card, and, most importantly, no outstanding application for legalization. Third, the government goes on in the same letter to argue that *Kasbati v. District Director*, 805 F.Supp. 619, 622 (N.D.Ill.1992), is persuasive on this matter. *Kasbati*, however, by the government's own briefing, is a § 245a.2(m)(1) case. Moreover, the remainder of the letter brief is devoted to arguing against the "brief, casual, and innocent" nature of the petitioner's trip.

As a final note on this point, the government's undeveloped argumentation on the timeliness of Fernandes's legalization application is out of place. For good reason, that issue was never raised by the IJ or BIA. Timeliness bears only on the fate of the application itself, not on the propriety of detaining and excluding Fernandes. To the extent that it is relevant, it is a matter for

the Legalization Unit of the INS, not for us today.[20]

In sum, by trading § 245a.2(m)(1) for § 1182(a)(7)(A)(i)(I), the government leaves one sinking ship for another. To exclude Fernandes without consideration of his outstanding legalization application or the reasons for his absence is to inflict the kind of "concrete injury" anticipated by the Supreme Court in *Reno v. CSS, supra,* when it remanded for a determination of whether plaintiffs' claims were ripe for judicial review.

## A. "Front-desking" and Concrete Injury

After upholding the district courts' jurisdiction to hear the *CSS* and *LULAC* challenges, the Supreme Court declined to decide whether those courts erred in extending the amnesty program deadline. As discussed above, it did so because plaintiffs had not shown that they were concretely affected by the challenged INS interpretations, rather than by another, unchallenged, INS rule. *See Reno v. CSS,* 509 U.S. at 58, 113 S.Ct. at 2496 (discussing, *inter alia, Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). Concrete injury could only be shown when a qualified, would-be applicant, *e.g.,* one who otherwise met the four general amnesty prerequisites, was denied the opportunity for amnesty through the enforcement of either invalidated interpretation. *See Reno v. CSS,* 509 U.S. at 56–64, 113 S.Ct. at 2495–99. "A plaintiff who sought to rely on the denial of his application to satisfy the ripeness requirement, however, would then still find himself at least temporarily barred by [IRCA's] exclusive review provision, since he would be seeking 'judicial review of a determination respecting an application.' 8 U.S.C. § 1255a(f)(1)." *Id.* at 60, 113 S.Ct. at 2497. Under IRCA, judicial review can only take place as part of an appeal of a deportation order. 8 U.S.C. § 1255a(f)(4)(A).

The Court noted an exception to IRCA's exclusive review scheme, however. Under INS policy, legalization clerks would review applications before accepting them for filing and reject those which were statutorily defective. This culling came to be called "front-desking," as it occurred at the front desk of legalization units. *Id.* at 63, 113 S.Ct. at 2498. Because IRCA's exclusive review procedures were predicated on the denial of an application through an administrative proceeding, "front-desked" applicants could appeal their prefiling rejection directly to the courts, and would not have those appeals barred by lack of ripeness:

> a class member whose application was "front-desked" would have felt the effects of the "advance parole" or "facially valid document" regulation in a particularly concrete matter, for his application for legalization would have been blocked then and there; his challenge to the regulation should not fail for lack of ripeness.

*Id.; accord Villarina v. INS,* 18 F.3d 765, 767 (9th Cir.1994) (Wallace, C.J.) (finding an absence of concrete injury and therefore lack of ripeness when IRCA petitioner neither applied for legalization nor demonstrated that he was "front-desked").

Because IRCA *requires* that a qualified applicant be granted lawful temporary resident status, "front-desking" undermines the purposes of IRCA by turning away aliens who were statutorily entitled to amnesty. See 8 U.S.C. § 1255a(a) ("The Attorney General *shall adjust the status of an alien to that of an alien lawfully admitted for temporary status* if the alien meets the following requirements. . . .") (emphasis added); *Reno v. CSS,* 509 U.S. at 67 n. 29, 113 S.Ct. at 2500 n. 29 ("each *CSS* or *LULAC* class member who was front-desked [was] entitled . . . to an adjustment of status"). It was to remedy a similarly unlawful deprivation, including the deprivation of those who may have been

---

**20.** I do not see in his papers that Fernandes "concedes" anything about the timeliness of his application. He testified that he applied for amnesty in Atlanta in December of 1989. See IJ Order at p. 2. On its face, his application falls beyond the judicially extended deadline of November 30, 1988. Nevertheless, petitioner was issued a work authorization card, indicating that his application was accepted. The government also defies the record when it says that "Fernandes is at best a potential legalization applicant." Government Letter–Brief, dated June 21, 1995, at p. 2 n. 2. The hearing transcript reflects that the INS itself submitted evidence that Fernandes was an actual applicant for legalization. (EH at p. 12).

dissuaded from even applying for amnesty,[21] that the *CSS* and *LULAC* courts extended the program's deadline. *See CSS v. Thornburgh*, 956 F.2d at 921–23.

 Although Fernandes has been ordered deported and is not restricted to an administrative appeal, the availability of judicial review provides him scant comfort because there is nothing of substance to review regarding his amnesty application. The BIA's denial of Fernandes's application, as part of its order of exclusion, has an effect equivalent to a "front-desking." Having satisfied the statutory requirements established by Congress, Fernandes was nevertheless denied temporary legal residency. Despite repeatedly stating that it lacked the authority to address the merits of the application and refusing to allow petitioner to advance such arguments on the record (EH at pp. 6, 9, 13; IJ Order at p. 3), the IJ quashed Fernandes's amnesty application. By preventing Fernandes from developing on the record the merits of his application, particularly whether he met the continuous physical presence requirement, the IJ preempted any meaningful review of his application.[22] The Supreme Court has warned against this "front-desking" danger.

> Front-desking would also have the further, and untoward, consequence for jurisdictional purposes, for it would effectively exclude an applicant from access even to the limited administrative and judicial review procedures established by [IRCA]. He would have no formal denial to appeal to the Associate Commissioner for Examinations, nor would he have an opportunity to build an administrative record on which judicial review might be based.

*Reno v. CSS*, 509 U.S. at 63, 113 S.Ct. at 2498–99 (footnote omitted).

Particularly when considering the importance of the petitioner's interest at stake, *see Perales*, 48 F.3d at 1313 ("For the purposes of our discussion, we assume that plaintiff class members have a protected interest in receiving amnesty based on IRCA's mandatory language that the Attorney General "shall" grant eligible aliens legalized status."), the INS's conduct here cannot stand.

### B. Advance Parole outside *CSS*: *De Oliveira*

At least one federal court has found that the same flaws discussed in *CSS* make advance parole equally inappropriate outside the CSS class. *See De Oliveira v. INS*, 873 F.Supp. 338 (C.D.Cal.1994) The facts in *De Oliveira* are close to our own. In 1988, De Oliveira, neither a *LULAC* nor a *CSS* class member, applied for amnesty. She had entered this country as a tourist in 1981 and then taken work illegally. Before a final decision was made on her application, she was informed that her mother in Brazil was ill and needed spinal column surgery. Although unsuccessful in obtaining advance approval to travel to Brazil to be with her mother,[23] she left the United States on November 7, 1991. Her return ticket was for November 24, but an airline strike prevented her departure at that time. After the strike, De Oliveira, now in the late stages of pregnancy, was advised not to fly. She delivered her baby in Brazil and returned to the United States on March 6, 1992. Stopped without valid entry papers, she was paroled into the country and placed in exclusion proceedings. *See De Oliveira*, 873 F.Supp. at 339–40. When the IJ's order of deportation was affirmed, De Oliveira filed a habeas petition. As in the present case, there was no substantive factual dispute. "The ultimate issue," as framed by the court, was:

---

**21.** The Court did not:

> rule out the possibility that further facts would allow class members who were not front-desked to demonstrate that the front-desking policy was nevertheless a substantial cause of their failure not to apply, so that they can be said to have had the 'advance parole' or 'facially valid document' regulation applied to them in a sufficiently concrete manner to satisfy ripeness concerns.

> *Reno v. CSS*, 509 U.S. at 66 n. 28, 113 S.Ct. at 2500 n. 28.

**22.** Judicial review "shall be based solely upon the administrative record established at the time of the review." 8 U.S.C. § 1255a(f)(4)(B).

**23.** Despite three attempts, petitioner was unable to get anyone at the INS Legalization Office even to hear her request. *See De Oliveira*, 873 F.Supp. at 339 n. 1.

whether petitioner was properly subject to exclusion upon her return to the United States because she departed without advance parole. In deciding this issue, we must determine whether the INS' regulations interpreting relevant portions of [IRCA] are valid.

*Id.* at 340.

Applying the same tools of statutory construction used in *CSS*, *De Oliveira* reached the same conclusion, although on the grounds that the INS regulation, in failing to give effect to clear and unambiguous statutory language, frustrated congressional intent. *See id.* at 341. *De Oliveira* declared the INS's interpretation "contrary to clear congressional intent" not to "encumber the historical meaning of a brief, casual, and innocent absence with artificial constraints such as arbitrary temporal limitations or advance parole," *id.* at 343, and therefore invalid "because it undercuts, rather than gives effect to, the expressed statutory intent." *Id.* (citations omitted).

Furthermore, *De Oliveira* rejected the INS's different treatment of pre-applicant aliens and applicant aliens (like De Oliveira and Fernandes). In 8 C.F.R. § 245a.1(f), the INS defined the statutory continuous presence requirement as "actual continuous presence in the United States since November 6, 1986 *until filing of any application for adjustment of status.*" (emphasis added). Looking to the plain meaning of the statute, however, the court determined that although Congress had specifically removed the continuous unlawful residence requirement after the date of application, it had not created a similar cut-off for the continuous physical presence requirement. *See id.* ("Congress' use of different language between the provisions of the continuous unlawful residency requirement and those of the continuous physical presence requirement demonstrates clearly that it did not intend to limit the

application of the continuous physical presence requirement to pre-application persons.").[24] It was the INS which created the differential treatment, contrary to the will of IRCA's framers, and in so doing it was the INS which denied to candidates for legalization the benefit of the "brief, casual, and innocent" exception which accompanies the physical presence requirement. The court rejected the disingenuous proposition that removing the continuous physical presence requirement after the date of application was a "benefit" to the alien.

What respondent gives petitioner as a "benefit" by asserting that the statutory continuous physical presence requirement does not apply to post-application persons, it takes away by creating its own limitation in its regulation at 8 C.F.R. § 245a.2(m)(1). Neither the benefit nor the "detriment" is authorized by statute. Both are invalid.

*Id.* at 342, n. 10.

Just as he must meet the continuous physical presence requirement as a legalization applicant, so, too, can Fernandes avail himself of the exception to that requirement carved out by Congress when it embedded the "brief, casual, and innocent" absence rule in the statute.

In addition, *De Oliveira* quite persuasively refutes the government's reliance in the present case on the IJ's use of 8 C.F.R. § 245a.2(m)(1) as the basis for Fernandes's deportation order. Although that regulation may not directly interpret the "brief, casual, and innocent" exception, it is no less invalid for its mistaken notion that pre-applicant and post-applicant persons are to be treated differently and for the havoc it plays with IRCA's amnesty program. *See De Oliveira,* 873 F.Supp. at 342 n. 8.

 I agree with and adopt the thorough reasoning of the *De Oliveira* court.[25] Its

---

**24.** In a letter brief addressing *De Oliveira,* the government completely misstates this clear finding:

"The district court in *De Oliveira,* however, held, *inter alia,* that because the IRCA only requires that a legalization applicant demonstrate continuous physical presence in the United States from November 6, 1986 *to the*

*date of application, see* 8 U.S.C. § 1255a(a)(3), the BIA wrongly applied the advance parole requirement...."
Government Letter Brief, dated June 21, 1995, p. 2 n. 1 (con't).

**25.** In doing so, I reject the reasoning in *Kasbati v. District Director of the INS,* 805 F.Supp. 619 (N.D.Ill.1992). The *Kasbati* court distinguished

four-step logic is equally cogent here, insofar as it sets forth: (1) that legalization candidates must meet the continuous physical presence requirement; (2) that as a part of that requirement, such persons may avail themselves of the "brief, casual, and innocent" absence exception; and (3) that the INS may not depart from congressional intent by saddling this exception with an advance parole prerequisite.

The fourth step is to determine if in fact the absence in question was "brief, casual, and innocent."

### III. Fernandes's Absence was Brief, Casual, and Innocent

 A final prong of the analysis remains. The government contends that even if Fernandes is not subject to exclusion for failure to obtain advance parole, he is nevertheless excludable because his absence was not "brief, casual, and innocent." See Mem. in Opp. at p. 20. The seminal and still leading case on the meaning of "brief, casual, and innocent" is *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). *Fleuti* considered the impact of a one-day excursion to Mexico on the status of a resident Swedish national. In doing so, it directly construed for the first time the meaning of section 101(a)(13) of the Immigration and Nationality Act of 1952, codified at 8 U.S.C. § 1101(a)(13). Section 1101(a)(13) defined the term "entry" for purposes of immigration laws.[26] The definition is a critical one, for any "entry" into the United States triggers admission requirements. After reviewing the pertinent case law and policy considerations, the Court determined that § 1101(a)(13) was intended by Congress to be liberally construed "to ameliorate the severe effects of the strict 'entry' doctrine." *Fleuti*, 374 U.S. at 462, 83 S.Ct.

at 1812. The Court concluded that "it effectuates congressional purpose to construe the intent exception to § 1101(a)(13) as meaning an intent to depart in a manner which can be regarded as *meaningfully interruptive of the alien's permanent residence." Id.* (emphasis added). The non-exclusive factors to determine whether an absence was intended as a disruption of an alien's resident status were: (1) the duration of the absence, (2) its purpose—particularly "if the purpose of leaving the country is to accomplish some object which is itself contrary to some policy reflected in our immigration laws," and (3) the need for documentation to make the trip. *Id.* When it is only "brief, casual, and innocent," an absence is not a "meaningful" one and the subsequent return to the United States is therefore not considered an "entry," and the normal admission requirements are not triggered. *See De Oliveira*, 873 F.Supp. at 344 ("In essence, these non-disruptive departures, or brief, casual, and innocent absences, are not departures which, upon return, require an entry and admission"). Noting that these factors would be developed by subsequent case law, the Court wrote:

> we declare today simply that an innocent, casual, and brief excursion by a resident alien outside this country's borders may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return. The more civilized application of our immigration laws given recognition by Congress in § 101(a)(13) and other provisions of the 1952 Act protects the resident alien from unsuspected risks and unintended consequences of such a wholly innocent action.

*Id.*

Although initially tailored to legal resident aliens, the *Fleuti* doctrine now extends to

---

the May 1988 *CSS* Order on the grounds that the regulation it invalidated (8 C.F.R § 245a.1(g)) was different from the regulation challenged in *Kasbati* (8 C.F.R. § 245a.2(m)(1)), in that the latter "has nothing to do with interpreting what constitutes an interruption in an applicant's continuous physical presence." *Kasbati*, 805 F.Supp. at 622. For the reasons discussed in the text, I find this to be a distinction that at closer examination shows little practical difference.

**26.** Section 1101(a)(13) provides that:

> [t]he term 'entry' means any coming of an alien into the United States, from a foreign port or place ... except that an alien having a lawful permanent residence in the United States shall not be regarded as making an entry ... if the alien proves ... that his departure to a foreign port or place ... was not intended or reasonably to be expected by him....

other groups as well. Congress, as discussed above, has added those seeking suspension of deportation, 8 U.S.C. 1254(b)(2), and those seeking legalization, 8 U.S.C. 1255a(a)(3)(B).[27]

The Second Circuit, like other circuits, has applied the *Fleuti* factors in such a way as to contextualize the absence and determine, in broad terms, "the significance of [the] absence" or "the meaningfulness of the interruption." *Heitland v. INS*, 551 F.2d 495, 500–01 (2d Cir.), *cert. denied*, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977); *see also Wadman v. INS*, 329 F.2d 812, 816 (9th Cir.1964) ("The question is whether the interruption, viewed in balance with the consequences, can be said to have been a significant one under the guides laid down in *Fleuti*."). This approach is consistent with IRCA's statutory scheme, as evidenced in 8 U.S.C. § 1245(b) ("An alien shall not be considered to have failed to maintain continuous physical presence in the United States ... if the absence from the United States was brief, casual, and innocent and did not meaningfully interrupt the continuous physical presence.").

The government relies on *Heitland*. The Heitlands were a German couple illegally residing in this country who returned to Germany for six weeks. After returning, their trip was found not to be "brief, casual, and innocent," their earlier application for change of status under § 212(a)(14) of the Immigration and Nationality Act was rejected, and they were ordered deported. Applying principles developed since *Fleuti*, the Court of Appeals began by noting, favorably, that the Heitlands intended on making the United States their permanent home, that the purpose of their trip was to visit Mr. Heitland's ailing sister, and that this intent and purpose were consistent with their return to the United States. *See Heitland*, 551 F.2d at 502.

Considering only these factors, which match the profile of the Fernandes trip, the Court noted that "these circumstances might favor application of the liberal principles of *Fleuti* to preserve the continuity of their presence." *Id.*

Only after discussing salient facts which *distinguish* the Heitlands' circumstances from Fernandes's did the Court determine that the Heitlands' absence was not "brief, casual, and innocent." First, the Heitlands "had no reasonable basis to expect the government to permit them to further remain in the United States." *Heitland*, 551 F.2d at 502. Fernandes, in contrast, does have a reasonable expectation of being allowed to stay, for although he is an illegal alien, he has a live application for lawful temporary residency under IRCA's amnesty program, he is a *LULAC* class member, and he was issued a work authorization card.[28] Thus, like plaintiffs in *Fleuti* and *Wadman, supra* (rejecting strict construction of "continuous physical presence," and finding that a five-day vacation in Mexico was not a disruption that would prevent a stay of deportation), and unlike the Heitlands, Fernandes "would not have been subject to deportation if [he] had simply remained within this country's borders." *Id.*

Secondly, the Court of Appeals found that "the interruptive significance of the Heitlands' six-week visit to Germany is further evidenced by the deliberateness with which it was undertaken and the implicit misrepresentations used to secure their return to the United States." *Id.* Mr. Heitland had used a Canadian passport to gain entry into the United States upon his return, representing that he was in transit to Canada; Mrs. Heitland gained entry with a temporary non-immigrant visa obtained while she was in Germany. Neither intended to comply with

---

**27.** The judicial development of the *Fleuti* doctrine was temporarily suspended by *INS v. Phinpathya*, 464 U.S. 183, 194, 104 S.Ct. 584, 591–92, 78 L.Ed.2d 401 (1984) (strictly interpreting *Fleuti* as applicable only to lawful resident aliens, not an unlawful alien "who could have been deported even had she remained in this country"). The government cites *Phinpathya*, but fails to note that it was overruled by Congress when it amended the suspension of deportation proceed-

ing statute with IRCA. See 8 U.S.C. § 1245(b); *CSS*, 685 F.Supp. at 1155; H.R.Rep. no. 682(I), 99th Cong. 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5649, 5682.

**28.** In *Heitland*, the Court of Appeals assumes that illegal presence alone might not preclude change of status eligibility. *See Heitland*, 551 F.2d at 502.

the implicit terms of his or her entry. This conduct was found to be "directly contrary to a 'policy reflected in our immigration laws.' " *Id.* at 503 (quoting *Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812). "To permit them to treat their six-week absence and re-entry as if these events had never occurred would be to reward them for what amounted to misleading conduct and would render meaningless the continuous presence requirement." *Id.*

In this context, the significance and meaningfulness of the Heitlands' departure "d[id] not present a picture of the type of hardship or injustice which *Fleuti* or its progeny were intended to remedy." *Id.* The same cannot be said here. Whereas the Heitlands' chances were undone by their deliberate deception, Fernandes has done nothing to foreclose the liberal Congressional intent reflected in *Fleuti.* On the contrary, no useful purpose is served by excluding Fernandes. It would be unreasonable on these facts, and unsupported by congressional intent, case law, or the plain language of the statute, to force Fernandes to choose between visiting his dying brother and keeping his hopes for legalization alive.

More pertinent than *Heitland* is the Court of Appeals' reasoning in *Itzcovitz v. Selective Service Local Brd. No. 6*, 447 F.2d 888 (2d Cir.1971). On three occasions, Itzcovitz asked the INS if, in going to Israel for a three-week training course required by his employer, he would be classified upon his return as an excludable alien. When he received no reply, Itzcovitz sought declaratory judgment that he would not be excludable upon his return. The Court ordered the declaratory relief, concluding that Itzcovitz's "return to the United States after his proposed trip to Tel Aviv would not constitute an 'entry' within § 101(a)(13) ... and the INS would therefore have no authority to exclude him." *Itzcovitz*, 447 F.2d at 891–92. The INS, first by its silence and then explicitly at oral argument, put Itzcovitz in the no-win position of having to choose between his job and legalization.

In removing him from this vice, the Court relied heavily on *Di Pasquale v. Karnuth*, 158 F.2d 878 (2d Cir.1947) (an alien convicted of bank robbery did not reenter the United States after traveling through Canada on his way by train from Buffalo to Detroit). In *Di Pasquale*, expressly approved by Congress when it enacted § 101(a)(13), Judge Learned Hand wrote of an alien's "vested interest in his residence," *id.* at 879, an interest that was not to "be subject to meaningless and irrational hazards." *Id.* The Supreme Court adopted Judge Hand's reasoning in *Delgadillo v. Carmichael*, 332 U.S. 388, 68 S.Ct. 10, 92 L.Ed. 17 (1947) (an alien merchant seaman's return to the United States after he was rescued at sea and taken to Cuba after his ship was torpedoed was not an entry). *Delgadillo*, also approved by Congress when it enacted § 101(a)(13), noted that "deportation can be the equivalent of banishment or exile." *Delgadillo*, 332 U.S. at 391, 68 S.Ct. at 12. Both *Delgadillo* and *Di Pasquale* called the stakes of residency "momentous." *Id.; Di Pasquale*, 158 F.2d at 879. Considering these precedents, the *Itzcovitz* Court wrote that "it is difficult to conceive that Congress meant its approval of the liberalization wrought by *Di Pasquale* and *Delgadillo* to be interpreted mechanistically to apply only to cases presenting factual situations identical to what was involved in those two decisions." *Itzcovitz*, 447 F.2d at 893.

The Court found that Itzcovitz did not depart "in a manner which can be regarded as meaningfully interruptive of the alien's permanent residence." *Id.* (quoting *Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812). The three-week duration was "fairly characterized as only temporary." *Id.* Although Itzcovitz did not have to leave, his trip was not a mere vacation and it was clearly important to his career. It did not weigh against him that, having sought prior approval, he was aware of the possible "immigration consequences" of his absence. *Id.* at 894. On the contrary, the Court found that "[t]he purpose of his trip is entirely bona fide, honorable and lawful. He has every intention of retaining permanently his residence in the United States." *Id.*

The purpose of Fernandes's trip, too, was "bona fide, honorable and lawful," and his intent to remain a U.S. resident is confirmed by his return and this petition.

Moreover, he seeks lawful temporary status on the same terms he was entitled to before he went to India. His absence was not planned to strengthen his application; he did not seek re-entry to avail himself of an opportunity not previously available to him. The government contends that Fernandes's request for advance parole indicates that he was not unaware of the possible consequences of his departure and cannot now seek to avoid those consequences. See Government's Letter Brief, dated June 21, 1995, at p. 4. As did the *Itzcovitz* Court, I reject the notion that a negative inference can be drawn simply from the attempt to seek advance parole. As discussed above, the idea of advance parole is contrary to Congress's expressed sensitivity to illegal aliens' natural distrust of immigration authorities, a distrust which could undermine the success of IRCA's amnesty program. Knowing that his own application was at stake, Fernandes did not attempt to skirt the advance parole rule. He should not now be made the worse off for his lack of guile. Case law does not indicate, contrary to the government's assertion, that a "casual" trip cannot involve any planning. See *id.* As seen in *Itzcovitz, Heitland,* and *De Oliveira,* a casual trip need not be undertaken without forethought. I therefore find that the first *Fleuti* factor, purpose, favors Fernandes.

As for duration, the second *Fleuti* factor, Fernandes's absence was temporary, and, in context, can be "fairly characterized" as brief. Three months is not an unreasonable amount of time to allow for the care of a dying family member.[29] Certainly, it was not Fernandes's intention to significantly interrupt his residency here and there is nothing manifest in these circumstances indicating that his absence was in any way meaningfully disruptive of his "continuous physical presence." Furthermore, while I acknowledge that three months is longer than the absences in the cases discussed above, no one *Fleuti* factor is determinative. See *Jubilado v. United States,* 819 F.2d 210, 212–213 (9th Cir.1987); *De Oliveira,* 873

F.Supp. at 344 ("While the length of a trip is relevant, it is not determinative because a longer trip consistent with the intent not to disrupt the alien's status in the United States will not constitute an entry upon return, while a shorter trip for improper purposes will.").

As to the third *Fleuti* factor, no evidence has been submitted that any particular documentation was needed for Fernandes to make his trip to India.

For the reasons explained above, I find that Fernandes's trip was a "brief, casual, and innocent" absence, and that his departure and return did not create an "entry" triggering the documentation requirements of an admission into the United States. It was error, therefore, to subject him to deportation proceedings. Exclusion punishes Fernandes for no other reason than his temporary departure. There is nothing inherently undesirable about a temporary departure, just as preventing amnesty applicants from leaving the United States is not an end in itself. Nor is it justified to punish Fernandes because he is an applicant only and not yet accepted into the amnesty program; after all, the program exists to give rights to persons not legally present in this country. See, e.g., *CSS,* 685 F.Supp. at 1156.

Unlike the INS and its advance parole requirement, Fernandes has undertaken no conduct "contrary to some policy reflected in our immigration laws." *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. Rather, his conduct speaks well of his character. The departure and the re-entry should not themselves be penalized. See *CSS,* 685 F.Supp. at 1158 ("Illegal entry or reentry into the United States, however, was not, without more, the type of unlawful conduct that would necessarily render an absence not innocent and therefore 'meaningful.' ").

### CONCLUSION

Stripped of the unjustifiable advance parole requirement, the INS has no reasonable basis to exclude and deport Fernandes. To

---

29. I note, but do not rely on, submissions from petitioner indicating both that his brother was suffering from a malignant lesion on his larynx (see Petitioner's Order to Show Cause, at Exhibit

D) and that his brother died from cancer of the larynx on December 8, 1993 (see Petitioner's Order to Show Cause, at Exhibit E).

deport Fernandes, who has satisfied IRCA's four prerequisites and whose application for lawful temporary residence is outstanding, would unlawfully thwart congressional intent. Fernandes's petition for habeas corpus is granted. Respondent's exclusion and deportation order is vacated. Petitioner is ordered restored to the status he was entitled to prior to his trip to India, as an applicant for legalization under § 254A of IRCA, 8 U.S.C. § 1255a.

SO ORDERED: