Shirley Maria DE OLIVEIRA, Petitioner,

v.

**UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE,**
Respondent.

No. CV 93–0624–TJH(GHK).

United States District Court,
C.D. California.

April 20, 1994.

Wade J. Chernick, Encino, CA, for petitioner.

U.S. Department of Justice, Patrick Walsh, Asst. U.S. Atty., Los Angeles, CA, for respondent.

*ORDER ADOPTING FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE*

HATTER, District Judge.

Pursuant to 28 U.S.C. § 636, the court has reviewed the petition, all of the records and files herein, and the attached Report and Recommendation of the United States Magistrate Judge. The court, having conducted a *de novo* review of the Magistrate Judge's Report and Recommendation to which Objections were interposed, approves and adopts the Magistrate Judge's findings, conclusions, and recommendations.

IT IS HEREBY ORDERED as follows:

(1) the petition for writ of habeas corpus is GRANTED;

(2) respondent's order of exclusion is VACATED; and

(3) respondent shall restore petitioner to whatever status she was entitled without regard to her 1991 trip to Brazil.

IT IS FURTHER ORDERED that the Clerk shall serve copies of this Order, the Magistrate Judge's Report and Recommendation, and the Judgment herein by United States mail on the petitioner and on the United States Attorney for the Central District of California.

*JUDGMENT*

Pursuant to the Order of the court adopting the findings, conclusions, and recommendations of the United States Magistrate Judge,

IT IS HEREBY ADJUDGED as follows:

(1) the petition for writ of habeas corpus is GRANTED;

(2) respondent's order of exclusion is VACATED;

(3) respondent shall restore petitioner to whatever status she was entitled without regard to her 1991 trip to Brazil.

REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

KING, United States Magistrate Judge.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636 and General Order No. 194 of the United States District Court for the Central District of California.

*Background*

In November, 1981, petitioner entered the United States as a tourist, but subsequently accepted work without authorization. In 1988, she applied for legalization under the amnesty provision of 8 U.S.C. § 1255a. While awaiting a final decision on her legalization application, petitioner learned that her mother was ill and required surgery of the spinal column to decompress the sciatic nerve. Her mother lives in Brazil.

Petitioner attempted to obtain advance parole from the Immigration and Naturalization Service (the "INS") to allow her to go to Brazil to tend to her mother. Despite her attempts,[1] petitioner was unable to obtain

---

1. According to petitioner's affidavit, she went to the Legalization Office on October 26, 1991 at

advance parole authorization. She flew to Brazil on November 7, 1991. According to counsel's representation, petitioner left her young child in the United States during her Brazilian trip. Her mother underwent surgery a day or so after petitioner's arrival in Brazil.

Petitioner had purchased an airline ticket with a return date of November 24, 1991. However, due to an airline strike, she was unable to return at that time. Thereafter, she was deemed medically unfit to travel because of the late stages of her pregnancy.[2] She returned to the United States on March 6, 1992, after the birth of her child.[3] Because she did not have valid entry documents, she was paroled into the United States and placed in exclusion proceedings.

On July 1, 1992, an Immigration Judge (IJ) ordered petitioner excluded from the United States. On December 4, 1992, the Board of Immigration Appeals (BIA) affirmed the IJ's decision. Thereafter, petitioner filed this habeas petition. Respondent has filed its opposition, and both sides have filed supplemental briefs. We have held hearings on the petition. At the June 22, 1993 hearing, respondent's counsel stated that the INS does not challenge the accuracy or credibility of petitioner's factual allegations or counsel's representations at the hearing. Accordingly, we accept the factual allegations and representations as true for purposes of these proceedings.

### Discussion

The ultimate issue before this court is whether petitioner was properly subject to exclusion upon her return to the United States because she departed without advance parole. In deciding this issue, we must determine whether the INS' regulations interpreting relevant provisions of the Immigration Reform and Control Act of 1986 are valid.

### I. Rules of Statutory Construction

In reviewing the INS' interpretation of the statute, we are confronted with two questions. First, we must determine whether Congress has directly spoken on the precise issue at hand. If, using traditional tools of statutory construction, we conclude that Congress had an intention on the precise issue at hand, that is the end of the matter because the court and the INS must give effect to that expressed Congressional intent. *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). We need not defer to agency interpretation. We merely determine whether the regulations give effect to the unambiguously expressed intent of Congress. *Id.*

Second, if Congress has not directly addressed the issue at hand, either by clear statutory language or legislative history, our inquiry is whether the INS' regulations are based on a permissible construction of the statute. At this point, we review the agency's interpretation deferentially and do not substitute our judgment in place of a reasonable interpretation by the agency. *See Id.* at 843–44, 104 S.Ct. at 2782–83.

The traditional tools of statutory construction require us to apply the plain meaning rule to the statutory language.[4] If

---

4:00 a.m. She waited until 8:00 a.m. when officials passed out numbers to those waiting in line. She was told to return the next day because there were insufficient numbers for everyone to see the Immigration Officer that day.

Petitioner next went to the Legalization Office on November 5, 1991. She was again denied an opportunity to see immigration officials, and was again told to return the next day. On November 7, 1991, she arrived at the Legalization Office at 3:00 a.m. She received a number when the offices opened, but was told that, due to a meeting, no one would be served until 12:30 p.m. She tried to explain that her plane was due to leave at 11:30 a.m., but to no avail.

**2.** Petitioner was seven months pregnant at the time of her trip to Brazil.

**3.** Although born abroad, the child was deemed an American citizen by virtue of her father's American citizenship. (*See* Petitioner's Memorandum in Support of Petition at 28).

**4.** There is authority that at the district court level, our first inquiry is whether there is binding authority construing the statute. *Tello v. McMahon,* 677 F.Supp. 1436, 1441 (E.D.Cal.1988). However, the parties have not called our attention to any such binding authority, and we have found none.

the statutory language is clear and unambiguous, we look to legislative history only to determine whether there is "clearly expressed legislative intention" contrary to the plain language of the statute. *INS v. Cardoza–Fonseca*, 480 U.S. 421, 432 n. 12, 107 S.Ct. 1207, 1213 n. 12, 94 L.Ed.2d 434 (1987). But, if the statutory language is not clear and unambiguous, we look to legislative history for guidance. *See Brock v. Writers Guild of America, West, Inc.*, 762 F.2d 1349, 1353 (9th Cir.1985).

## II. *Immigration Reform and Control Act of 1986*

### A. *Continuous Physical Presence*

■ The statutory scheme directs the Attorney General to adjust the status of an alien to that of a lawfully admitted temporary resident alien if he or she meets certain requirements. In addition to the filing of a timely application, the alien must show that, *inter alia*, he "has been continuously physically present in the United States since November 6, 1986." 8 U.S.C. § 1255a(a)(3)(A) (the continuous physical presence requirement). The statute does not contain limiting language which provides that this requirement ceases to exist upon the filing of the amnesty application. To the contrary, the use of the word "since" without prior or subsequent modification indicates that Congress required the alien to maintain continuous physical presence from November 6, 1986 until his status is adjusted by the Attorney General.[5]

The scope of this continuous physical presence requirement is made even clearer when compared with the preceding subparagraph of the statute which provides that "[t]he alien

must establish that he entered the United States before January 1, 1982, and that he has resided continuously in the United States in an unlawful status since such date and *through the date the application is filed under this subsection.*" 8 U.S.C. § 1255a(a)(2)(A) (the continuous unlawful residency requirement). (Emphasis added). The statute specifically limits this requirement to pre-application persons.[6]

In light of the foregoing, we cannot conclude that Congress merely forgot to include a similar limitation in the continuous physical presence requirement. Congress' use of different language between the provisions of the continuous unlawful residency requirement and those of the continuous physical presence requirement demonstrates clearly that it did not intend to limit the application of the continuous physical presence requirement to pre-application persons. *See Cardoza–Fonseca*, 480 U.S. at 432, 107 S.Ct. at 1213 (Congress generally presumed to have acted intentionally and purposely when particular language of one section of statute is omitted from another section of the same Act).

Congress knew when it wanted to limit its requirements and when it did not want to do so. We conclude that the statute clearly and unambiguously requires continuous physical presence from November 6, 1986 to the date the application is approved, except for brief, casual and innocent absences occurring at any time during that interim.[7]

Because the statutory language is clear and unambiguous, we must determine whether the regulations give effect to the expressed statutory intent. We conclude that they do not.

---

5. But, for purposes of this continuous physical presence requirement, "[a]n alien shall not be considered to have failed to maintain continuous physical presence in the United States for purpose of subparagraph (A) by virtue of brief, casual and innocent absences from the United States." 8 U.S.C. § 1255a(a)(3)(B).

6. This limitation in the continuous unlawful residency requirement is necessary because an alien who has filed an amnesty application setting forth a prima facie case for relief cannot be viewed as being in the United States in "unlawful" status. The statute guarantees protection

from deportation and grants work permission pending decision on the application. 8 U.S.C. § 1255a(e)(2)(A), (B). On the other hand, because the continuous physical presence requirement does not refer to legal status, logic does not compel its termination at the filing of the amnesty application.

7. The legislative history does not implicitly or explicitly contradict the plain language of the statute. *See generally* H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess., at 71–72 (1986), *reprinted in*, 1986 U.S.C.C.A.N. at pp. 5649, 5675, 5676.

■ At oral argument, respondent's counsel conceded that by regulations, the INS has devised a scheme which treats persons who had applied, but had not received approval, for amnesty (post-application) differently from those who had yet to apply for amnesty (pre-application).

The INS' regulation at 8 C.F.R. §§ 245a.1(f) defines the statutory continuous physical presence requirement as "actual continuous presence in the United States since November 6, 1986 *until filing of any application for adjustment of status.*" 8 C.F.R. § 245a.1(f) (1993). (Emphasis added). By adding the emphasized phrase, this regulation undercuts the statutory continuous physical presence requirement by terminating its effect at the time of the filing of the amnesty application, thereby denying post-application persons the benefit of the statutory brief, casual and innocent absence provision.[8] Because this regulation limits that which the statute has specifically left

unlimited, it is contrary to the clear intent of the statute and is therefore invalid.

At one of the oral hearings, we specifically pointed out this conflict to respondent's counsel, and ordered further briefing so that the court would be given the benefit of the agency's arguments in support of its regulations. But, in reviewing the post-hearing briefing, we find that the agency chose not to address this conflict. We conclude that it did not address this issue because it was unable to provide a rational reason why the regulations are not contrary to the statute.[9]

In light of the foregoing, we conclude that the continuous physical presence requirement does not end at the time of the amnesty application, and that the brief, casual and innocent provisions of 8 U.S.C. § 1255a(a)(3)(B) apply to post-application persons such as petitioner.[10] Any regulation inconsistent with such statutory provision is invalid.[11]

---

8. According to the INS, because the brief, casual and innocent provision in 8 U.S.C. § 1255a(a)(3)(B) applies only to pre-application persons, its regulation defining brief, casual and innocent absences [8 C.F.R. § 245a.2(1)(2)], which we also rule invalid (*infra.* at 342–344), does not apply to post-application persons such as petitioner. Moreover, the INS has resisted the extension of the brief, casual and innocent doctrine derived from *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963) to legalization applicants.

Instead, it asserts that 8 C.F.R. § 245a.2(m)(1) which requires advance parole for readmission for any departures by a post-application person is the only regulation applicable to petitioner. Because 8 C.F.R. § 245a.2(m)(1) incorporates the mistaken notion that post-application persons are to be treated differently from pre-application persons for purposes of the statutory continuing physical presence requirement and the ancillary statutory brief, casual and innocent absence doctrine, we conclude that this regulation is likewise invalid.

9. At oral argument, respondent's counsel pointed to 8 U.S.C. § 1255a(g)(2) as some evidence that Congress intended to grant the INS permission to define the statutory provision more specifically by regulations. But, 8 U.S.C. § 1255a(g)(2) has nothing to do with the issue at hand since, by its own terms, it applies only to the continuous residency requirement, not the continuous physical presence requirement.

While 8 U.S.C. § 1255a(g)(1)(B) permits the Attorney General to prescribe "such other regulations as may be necessary to carry out this

section[,]" this authorization is not an invitation to change the plain meaning of the statute.

10. What respondent gives petitioner as a "benefit" by asserting that the statutory continuous physical presence requirement does not apply to post-application persons, it takes away by creating its own limitation in its regulation at 8 C.F.R. § 245a.2(m)(1). Neither the "benefit" nor the "detriment" is authorized by statute. Both are invalid.

11. We need not consider whether the *Fleuti* doctrine should be "extended" to legalization applicants because 8 U.S.C. § 1255a(a)(3)(B) already applies the brief, casual and innocent doctrine to persons such as petitioner.

We recognize that *Kasbati v. District Director of Immigration and Naturalization Service*, 805 F.Supp. 619 (N.D.Ill.1992) and other unpublished decisions of other judges of this court have concluded that the *Fleuti* doctrine, as such, does not extend to legalization applicants. *But see contra Campos v. Smith*, 791 F.Supp. 262 (W.D.Wash.1991) (*Fleuti* doctrine applicable to legalization applicants). However, none of these cases focused on the statutory language of 8 U.S.C. § 1255a(a)(3)(B) which specifically applies the brief, casual and innocent absence doctrine to legalization applicants, both pre-application and post-application. Because we are not applying or extending *Fleuti*, but merely giving meaning to the requirement of the statute, we do not view the foregoing authority as either contrary or applicable here.

**B.** *Brief, Casual and Innocent Absence*

■ The statute provides that for purposes of the continuous physical presence requirement, "[a]n alien shall not be considered to have failed to maintain continuous physical presence in the United States for purposes of [8 U.S.C. § 1255a(a)(3)(A) ] by virtue of brief, casual and innocent absences from the United States." 8 U.S.C. § 1255a(a)(3)(B).

Because the phrase "brief, casual and innocent absence" is neither defined in the statute itself nor susceptible to a single ordinary or normal meaning which is readily discernible from the words themselves, we look to legislative history for guidance.

Here, we find that this phrase has a historical meaning [12] which does not include the requirement of advance parole. *See Fleuti*, 374 U.S. at 462, 83 S.Ct. at 1812 (construing 8 U.S.C. § 1101(a)(13); *see also Wadman v. INS*, 329 F.2d 812, 815–16 (9th Cir.1964) (in the context of suspension of deportation in 8 U.S.C. § 1254).[13]

Moreover, Congress was well aware of the historical meaning of the phrase. John R. Bolton, then Assistant Attorney General, discussed the *Fleuti* doctrine in his comments on the use of the phrase "brief, casual and innocent" in § 1255a in his June 4, 1986 letter to the Chairman of the House Judiciary Committee. H.R.Rep. No. 682(I), 99th

Cong.2d Sess., at 116, *reprinted in* 1986 U.S.C.C.A.N. at pp. 5649, 5720.[14]

" 'Where words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country they are presumed to have been used in that sense unless the context compels to the contrary.' " *Lorillard v. Pons*, 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978) *quoting Standard Oil v. United States*, 221 U.S. 1, 59, 31 S.Ct. 502, 515, 55 L.Ed. 619 (1911). Nothing in 8 U.S.C. § 1255a "compels to the contrary." *See id.*

From the foregoing, we conclude that Congress intended not to encumber the historical meaning of a brief, casual and innocent absence with artificial constraints such as arbitrary temporal limitations or advance parole. But, contrary to clear Congressional intent, the INS defines a brief, casual and innocent absence as

> a departure *authorized by the Service (advance parole)* subsequent to May 1, 1987 of not more than thirty (30) days for legitimate emergency or humanitarian purposes unless a further period of authorized departure has been granted in the discretion of the district director or a departure was beyond the alien's control.

8 C.F.R. § 245a.2(*l*)(2) (emphasis added). We conclude that this regulation is invalid because it undercuts, rather than gives effect to, the expressed statutory intent.[15] *See*

---

**12.** *See* discussion of the historical meaning of "brief, casual and innocent absence" derived from *Fleuti infra* at 344.

**13.** Even the INS understood that the traditional *Fleuti* doctrine does not require advance parole. In 1968, the Commissioner promulgated then 8 C.F.R. § 245.2(a)(3) which in effect extended the *Fleuti* doctrine to aliens seeking adjustment of status. Significantly, this regulation recognized that aliens may be deemed not to have interrupted their permanent residency application by absences which were *either* by prior approval of the INS, *or* brief, casual and innocent. This regulation remained in force until after the enactment of 8 U.S.C. § 1255a(a)(3)(B) in 1986. After January 1, 1987, § 245.2(a)(3) was redesignated as § 245.2(a)(4)(ii) which, among other things, deleted the reference to brief, casual and innocent absences. *Compare* 8 C.F.R. § 245.2(a)(3) (1986) with 8 C.F.R. § 245.2(a)(4)(ii) (1987).

**14.** The Reagan Administration commented to the Judiciary Committee that it

believes that the provisions [of the Immigration Reform and Control Act of 1986] relating to 'brief, casual, and innocent' absences ... will be extremely difficult to administer. Application of this standard is not supported by *Rosenberg v. Fleuti*, 374 U.S. 449 [83 S.Ct. 1804, 10 L.Ed.2d 1000] (1963). *Fleuti* applied only to lawful permanent resident aliens, not aliens illegally in the United States.

In light of this belief, the Administration "suggest[ed] that absences of a specific period of time i.e., no more than fifteen days in the aggregate, from the date chosen for legalization, constitute the qualifying limit." H.R.Rep. No. 99–682(I), 99th Cong., 2d Sess., at 116, *reprinted in*, 1986 U.S.C.C.A.N. at pp. 5649, 5720.

In the final version of the Act, Congress chose not to incorporate the Administration's suggestion.

**15.** The District Court in *Catholic Social Services, Inc. v. Meese*, 685 F.Supp. 1149, 1160 (E.D.Cal. 1988), *vacated on other grounds sub nom., Reno v. CSS*, —— U.S. ——, 113 S.Ct. 2485, 125

*Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82.

### III. *Plaintiff's Trip to Brazil*

■ But, the foregoing analysis does not end our inquiry. We must determine whether petitioner's trip qualifies as a brief, casual and innocent absence within the meaning of 8 U.S.C. § 1255a(a)(3)(B).[16]

Because this statutory phrase was borrowed from *Fleuti,* we examine its meaning as set forth by the Supreme Court in *Fleuti.* In *Fleuti,* the issue was whether a permanent resident alien's return to the United States after a brief day-trip to Mexico constituted entry requiring admission into the United States. In construing a statutory exception to the broad definition of "entry" requiring admission, the Supreme Court held that the statutory exception for unintended departures by permanent resident aliens must be read to mean any departure which was not intended by the alien to be meaningfully disruptive of his permanent residence. *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. In essence, these non-disruptive departures, or brief, casual and innocent absences, are not departures which, upon return, require an entry and admission.[17] The Court looked to three factors: the length of the trip, its purpose, and the necessity of travel documents. *Id.*

In construing *Fleuti,* the Ninth Circuit has engaged in a balancing of these three factors. *Jubilado v. United States,* 819 F.2d 210, 212 (9th Cir.1987). This Circuit recognizes that not any one factor is determinative. For example, while the length of the trip is relevant, it is not determinative because a longer trip consistent with the intent not to disrupt the alien's status in the United States will not constitute an entry upon return while a shorter trip for improper purposes will. *Id.* at 212–13.

In this case, petitioner was absent physically from the United States for about four months. However, not all of that time was an absence of her own volition. Except for about a two-week period as evidenced by petitioner's return airline ticket, the remainder of the trip was necessitated by events beyond her control. Because the government does not dispute that those intervening events prevented any earlier return, we view petitioner's trip as one of about two weeks. We conclude that the trip was of short duration, particularly in light of its purpose.

The second factor also weighs in petitioner's favor. The uncontested purpose of the trip was lawful and innocent. It was to tend to petitioner's mother who was then scheduled for major surgery. There was no intent to meaningfully interrupt petitioner's application for legalization. Quite the opposite is true. The need for the trip arose by chance. Petitioner's return airline ticket and her child remaining in the United States during her trip all point to her indisputable intent to pursue her application for legalization in the United States.

The third *Fleuti* factor is the presence of travel documents. In this case, the record is devoid of evidence of travel documents, other than petitioner's airline ticket. While it can be argued that petitioner's purchase of an airline ticket should have caused her to consider the implications of her departure, such consideration alone does not address the precise issue here.

Clearly, petitioner considered the implications of her departure. She went to the INS offices three times to seek advance parole.[18] The issue is whether having considered the implications of her departure, petitioner's ab-

---

L.Ed.2d 38 (1993), likewise invalidated this regulation. Indeed, the INS did not appeal the court's order invalidating this regulation; it merely appealed the subsequent remedial orders. *Reno v. CSS,* —— U.S. ——, 113 S.Ct. at 2491.

**16.** Because respondent's counsel does not dispute the facts surrounding petitioner's trip abroad, the application of legal principles to undisputed facts is a question of law which we can decide without remand to the agency.

**17.** While the statute at issue in *Fleuti* does not specifically refer to admission or readmission, it is implicit that if there is an entry, there must be admission for such entry.

**18.** In light of our conclusion that petitioner did not need advance parole, we mention this fact only as it may bear upon whether petitioner had any intent to meaningfully interrupt her legalization status.

sence evidenced an intent to meaningfully disrupt her legalization status. Under the totality of the circumstances of this case, and for all the reasons set forth in our discussion of the second *Fleuti* factor, *supra*, we conclude that the presence of whatever travel documents petitioner might have had did not negate her plain intent not to disrupt her application process.[19]

*Munoz–Casarez v. INS*, 511 F.2d 947 (9th Cir.1975) (per curiam) does not compel a different result. There, petitioner had left the country to visit his parents and a sick sister. He was gone for 30 days, and had planned and saved for the trip for 5 years. The court found that petitioner was subject to exclusion proceedings because his return necessitated a re-entry. *Id.* at 948–49.

After weighing the factors relevant to our case, we find that *Munoz–Casarez* is distinguishable. First, petitioner was only absent for approximately two weeks.[20] More significantly, petitioner's trip was unexpected and casual, whereas Munoz–Casarez's trip was preplanned over a long period of time. Finally, as the Ninth Circuit noted in *Jubilado*, "[t]he per curiam opinion [in *Munoz–Casarez* ] does not, however, discuss the relevance of the purpose of Munoz–Casarez's trip, to visit his parents and a sister who was ill, to its holding that Munoz–Casarez's departure was meaningfully interruptive of his permanent residence. We feel *Fleuti* requires that the trip's purpose be considered." *Jubilado*, 819 F.2d at 214. Accordingly, *Munoz–Casarez* is not controlling here.

### Conclusion

Petitioner's absence was not a departure which effected an entry requiring admission

upon her return. Therefore, it was error to subject her to exclusion proceedings. The Magistrate Judge recommends that the District Judge issue an order (1) granting the petition for writ of habeas corpus, (2) vacating respondent's exclusion order, (3) restoring petitioner to whatever status she was entitled without regard to her 1991 trip to Brazil, and (4) approving and adopting this Report and Recommendation.

Dated: This 21 day of March, 1994

---

**19.** We reject respondent's suggestion that granting relief to petitioner under the facts of this case would be detrimental to the "public interest because it will be re-writing the law to allow aliens to remain in the United States that Congress specifically intended to be excluded." Respondent's Memorandum in Opposition to Petition for Writ of Habeas Corpus at 8. Respondent cites no authority for its assertion that Congress specifically intended to exclude aliens in petitioner's situation.

To the contrary, the amnesty provisions of the Act are remedial. They must be liberally construed so as to effectuate the Congressional purpose of permitting longtime illegal alien residents to apply for and obtain legalization of their status. *See Bailey v. Brooks*, 688 F.Supp. 575, 578 (W.D.Wash.1986) (describing liberal construction of the continuous residency requirement for legalization under the 1986 Act).

In this case, denying relief to an amnesty applicant who has two American citizen children residing in the United States, who earnestly, though as we hold unnecessarily, sought to comply with respondent's advance parole requirement, and who left the country only to be with her ailing mother as she underwent spinal surgery, would be, if anything, contrary to Congressional purpose in enacting this remedial statute.

**20.** *See* discussion *supra* at 344.