Gabriel ESPINOZA–GUTIERREZ,
Petitioner–Appellant,

v.

Richard C. SMITH, District Director,
Immigration and Naturalization
Service, Respondent–Appellee.

No. 95–35409.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 11, 1996.

Decided Sept. 3, 1996.

Eric Bakken, Dan P. Danilov, and Mark B. Nerheim, on the brief, Seattle, Washington, for petitioner-appellant.

Donald E. Keener, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for respondent-appellee.

Before: WRIGHT, PREGERSON and TASHIMA, Circuit Judges.

TASHIMA, Circuit Judge:

Petitioner Gabriel Espinoza–Gutierrez ("Espinoza"), an applicant for legalization under 8 U.S.C. § 1255a, appeals the denial of his petition for a writ of habeas corpus. Espinoza was put into exclusion proceedings while attempting to return from a four-day trip to Mexico because he had not received advance parole from the Immigration and Naturalization Service ("INS") prior to his departure. The district court had jurisdiction under 8 U.S.C. § 1105a(b). We have jurisdiction under 28 U.S.C. §§ 1291 and 2253, and we reverse and remand. Petitioner also appeals the district court's determination that it had no jurisdiction to review the denial of his legalization application. We affirm that ruling.

The first issue on appeal is whether Espinoza's return without advance parole constituted an "entry" into this country within the meaning of the Immigration and Nationality Act ("INA"), 8 U.S.C § 1101(a)(13). To decide this question, we must determine whether the "brief, casual, and innocent" language of 8 U.S.C. § 1255a(a)(3)(B) applies to legalization applicants stopped at the border. We conclude that under the INS's permissible construction of the statute, § 1255a(a)(3)(B) does operate as a border-control mechanism. We further conclude that INS regulations requiring advance parole conflict with the historical meaning and application of the "brief, casual, and innocent departure" doctrine and are, therefore, invalid. *See* 8 C.F.R. §§ 245a.2(*l*)(2) & (m)(1).

## FACTS

Espinoza is a 32–year old native and citizen of Mexico, who entered the United States illegally in 1973. Since that time, he has resided continuously in Yakima Valley, Washington. In 1988, Espinoza applied for legalization under 8 U.S.C. § 1255a. Espinoza's legalization application was initially denied, and he filed appeals with the proper administrative authorities.

His application was on appeal to the Legalization Appeals Unit ("LAU"), in May, 1993, when he flew to Guadalajara, Mexico, to check on some property for his parents. He did not inform or request permission from the INS prior to his departure. Upon his return from Mexico four days after his departure, an immigration inspector at Houston

International Airport determined that Espinoza did not possess documents that would allow his entry into the United States, and placed him into exclusion proceedings. Both the Immigration Judge ("IJ") and the Board of Immigration Appeals ("BIA") rejected Espinoza's argument that he could not be placed into exclusion proceedings while his legalization application was pending.

Espinoza thereafter filed a petition for a writ of habeas corpus. In seeking the writ, Espinoza abandoned the arguments pursued in front of the IJ and BIA. For the first time, Espinoza argued that the INS had erroneously instituted exclusion proceedings against him because he did not "enter" the country, as his absence from the United States was "brief, casual, and innocent." After filing his opening brief in the district court, the LAU denied Espinoza's legalization appeal. In his reply brief, Espinoza also asked the district court to review the merits of the LAU decision.

The district court concluded that the "brief, casual, and innocent" exception to the entry doctrine does not apply to legalization applicants stopped at the border and, therefore, denied the writ. The district court also determined that it did not have jurisdiction to review the LAU decision.

## DISCUSSION

### I. Statutory Overview

Because this case involves various immigration statutes, INS regulations interpreting and applying those statutes and case law, a brief overview of the law is necessary before analyzing the parties' arguments.

### A. IRCA and the Regulations

In 1986, Congress passed the Immigration Reform and Control Act of 1986 ("IRCA"), Pub.L. No. 99–603, *reprinted in* 1986 U.S.C.C.A.N. 5649 (100 Stat. 3359). IRCA established a statutory scheme allowing un-

lawful aliens who had been residing continuously in the United States since January 1, 1982, to apply for legalization. 8 U.S.C. § 1255a. To qualify, an applicant must satisfy four requirements: (1) timely application; (2) continuous unlawful residence since 1982; (3) continuous physical presence since November 6, 1986; and (4) admissibility as an immigrant. 8 U.S.C. § 1255a(a). Applicants meeting these requirements are granted temporary lawful status and, eventually, permanent lawful status. 8 U.S.C. § 1255a(a) & (b).

The continuous physical presence requirement of § 1255a(a)(3) is qualified by subsection (B), which provides: "An alien shall not be considered to have failed to maintain continuous physical presence in the United States ... by virtue of brief, casual, and innocent absences from the United States." 8 U.S.C. § 1255a(a)(3)(B). The INS defines a "brief, casual, and innocent" absence as "a departure authorized by the Service (advance parole) ... of not more than thirty (30) days for legitimate emergency or humanitarian purposes ... or a departure ... beyond the alien's control." 8 C.F.R. § 245a.2(*l*)(2). According to the regulations, legalization applicants must have received advance parole from the INS to be readmitted to the country. 8 C.F.R. § 245a.2(m)(1).[1]

### B. The *Fleuti* Doctrine

The "brief, casual, and innocent" language of § 1255a(a)(3)(B) is a direct descendant of the Supreme Court's decision in *Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963). *Fleuti* held that a permanent lawful alien resident did not "enter" the country after a "brief, casual, and innocent" absence from the United States. *Id.* at 462, 83 S.Ct. at 1812. In practice, courts balance the length of the trip, its purpose, and the presence of travel documents to determine whether an absence was "brief, casual, and innocent." *Jubilado v. United States*, 819 F.2d 210, 212 (9th Cir.1987).

---

1. Section 245a.2(m)(1) provides:
   During the time period from the date that an alien's application establishing prima facie eligibility for temporary resident status is reviewed at a Service Legalization Office and the date status as a temporary resident is granted,

the alien applicant can only be readmitted to the United States provided his or her departure was authorized under the Service's advance parole provisions contained in § 212.5(e) of this chapter.
8 C.F.R. § 245a.2(m)(1).

Aside from the *Fleuti* doctrine exception, every alien who comes into the United States is deemed to be "entering," and is subject to inspection and must meet admission requirements. 8 U.S.C. §§ 1101(a)(13) & 1181(a). Entering aliens who do not meet admission requirements must be excluded from admission to the United States. 8 U.S.C. § 1182(a).[2]

Exclusion proceedings can only be instituted against aliens who are "entering" the country. *Landon v. Plasencia*, 459 U.S. 21, 28, 103 S.Ct. 321, 326–27, 74 L.Ed.2d 21 (1982). Thus, aliens who do not "enter" the country within the meaning of the INA cannot be excluded from the country.

## II. Exhaustion of Remedies

■ Although Espinoza's entire argument on this petition is that he did not "enter" the country, and thus cannot be excluded, he did not raise this argument before the IJ or BIA. Ordinarily, we cannot review an order of exclusion "if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws...." 8 U.S.C. § 1105a(c). Typically, a failure to raise an issue below "constitutes a failure to exhaust remedies with respect to that question and deprives this court of jurisdiction to hear the matter." *Vargas v. United States Dept. of Immigration and Naturalization*, 831 F.2d 906, 907–08 (9th Cir.1987) (citing *Tejeda–Mata v. INS*, 626 F.2d 721, 726 (9th Cir.1980), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2280, 73 L.Ed.2d 1291 (1982)). Thus, we must first consider whether we have jurisdiction to consider the merits of Espinoza's appeal. We review questions of subject matter jurisdiction *de novo. Xiao v. Barr*, 979 F.2d 151, 153 (9th Cir.1992).

In *Landon*, the Supreme Court held that the determination of whether a petitioner is

entering the country is an issue that should be decided in an exclusion hearing by an IJ. 459 U.S. at 31, 103 S.Ct. at 328. This circuit has interpreted *Landon* to mean that IJs have the authority to determine their own jurisdiction. *Castillo–Magallon v. INS*, 729 F.2d 1227, 1228–29 (9th Cir.1984). "Since habeas corpus review of an order of exclusion is permitted under section 1105a(c) only following exhaustion of administrative remedies, it follows from section 1105a and *Castillo–Magallon*, that the question of jurisdiction must first be litigated in the exclusion proceedings themselves." *Xiao*, 979 F.2d at 155. As claimants are required to raise the entry doctrine to an IJ, Espinoza's failure to do so is fatal, unless an exception to the exhaustion doctrine applies.

■ We have long held the exhaustion doctrine does not bar review of questions involving the constitutionality of INA statutes and regulations because the BIA has no jurisdiction over those issues. *See, e.g., Liu v. Waters*, 55 F.3d 421, 425 (9th Cir.1995); *Hernandez–Rivera v. INS*, 630 F.2d 1352, 1355 (9th Cir.1980). Applying this same reasoning, we hold today that the exhaustion doctrine does not bar review of a question concerning the validity of an INS regulation because of conflict with a statute.

The INS must follow its own regulations. *Bui v. INS*, 76 F.3d 268, 269 (9th Cir.1996). Accordingly, had Espinoza argued below that the regulations requiring advance parole conflict with § 1255a(a)(3)(B), the argument would necessarily have fallen on deaf ears. The BIA simply has no authority to invalidate a regulation that it is bound to follow. As Espinoza could not have received meaningful review of this issue from the IJ or BIA, he has not failed to avail himself of an administrative remedy, as required by

---

2. Although aliens who do not "enter" the country by virtue of "brief, casual, and innocent" absences cannot be excluded, they may, nonetheless, be subject to a deportation hearing. 8 U.S.C. § 1251(a)(1)(B) ("Any alien who entered the United States without inspection or at any time or place other than as designated by the Attorney General or is in the United States in violation of this chapter or any other law of the United States is deportable"). *See also Correa v. Thornburgh*, 901 F.2d 1166, 1171 (2d Cir.1990)

("An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.") (citation omitted); *Garcia–Mir v. Smith*, 766 F.2d 1478, 1484 (11th Cir.1985) ("Deportable aliens ... have succeeded in either legally or illegally entering this country.") (per curiam).

§ 1105a(c). We therefore have jurisdiction to consider whether a regulation violates a federal statutory right. *Cf. Campos v. Nail,* 43 F.3d 1285, 1290 (9th Cir.1994) (stating in the context of an immigration class action suit, "jurisdiction exists even if [a] policy violated only federal statutory rights").

## III. Scope and Construction of Section 1255a(a)(3)(B)

■ Turning to the merits, we must first determine whether § 1255a(a)(3)(B)'s "brief, casual, and innocent" language applies to legalization applicants stopped at the border. By use of the phrase "brief, casual, and innocent," it is uncontested that Congress intended to extend the *Fleuti* doctrine to the legalization application process. *See Mendoza v. INS,* 16 F.3d 335, 337 (9th Cir.1994) ("Barring a congressional mandate, such as 8 U.S.C. §§ 1254(b)(2) and *1255a(a)(3)(B),* the *Fleuti* doctrine applies only to lawful permanent resident aliens.") (emphasis added); *Catholic Social Serv., Inc. v. Meese,* 685 F.Supp. 1149, 1153–54 (E.D.Cal.1988) ("*CSS I*") (*Fleuti* doctrine applies to legalization applicants), *aff'd,* 956 F.2d 914 (9th Cir.1992), *vacated and remanded on jurisdictional grounds,* 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993). What is less clear, however, is the function Congress intended the *Fleuti* doctrine to serve in the legalization application process.

Espinoza argues that the *Fleuti* doctrine applies to legalization applicants stopped at the border. Thus, according to Espinoza, he should have been entitled to be readmitted to the United States, provided his trip was "brief, casual, and innocent." The INS, on the other hand, argues that § 1255a(a)(3)(B) applies not at the border, but in legalization offices. That is, subsection (B)'s only purpose is to preclude a denial of temporary lawful status based on short absences from the country. Because the LAU did not deny Espinoza temporary lawful status because of his trip to Guadalajara, the INS contends that § 1255a(a)(3)(B) is irrelevant to a discussion of Espinoza's legal rights. The district court agreed with the INS's interpretation of the statute and, therefore, denied the writ. We review the decision to grant or deny a petition for habeas corpus *de novo. Singh v. Ilchert,* 63 F.3d 1501, 1506 (9th Cir.1995).

In deciding the scope of § 1255a(a)(3)(B), we must consider two questions. First, we must decide whether Congress has directly addressed the precise issue at hand. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). If we conclude that Congress expressed an intention, then we must give effect to congressional intent without deferring to agency interpretation. *Id.* If, on the other hand, we conclude that Congress has not directly addressed the issue at hand, we must first look to the INS's own construction of the statute. *Id.* at 843, 104 S.Ct. at 2782. If the INS's answer is based on a permissible construction of the statute, we must defer to the agency, as it is charged with the administration and implementation of immigration laws. *Id.; accord Barrera–Echavarria v. Rison,* 44 F.3d 1441, 1444–45 (9th Cir.) (en banc), *cert. denied,* —— U.S. ——, 116 S.Ct. 479, 133 L.Ed.2d 407 (1995).

### A. Did Congress Address the Precise Issue At Hand?

First, we consider whether Congress clearly and unambiguously defined the scope of § 1255a(a)(3)(B). We conclude that it did not.

On its face, subsection (B) qualifies the continuous physical presence requirement of 8 U.S.C. § 1255a(a)(3)(A). It does not, either expressly or implicitly, indicate whether or not it is to be applied as a border-crossing mechanism.

The INS argues, however, that by reference to other statutes, it becomes clear that Congress did not intend subsection (B) to extend to the border. First, the INS relies on § 1255a(a)(3)(C), which provides:

Nothing in this section shall be construed as authorizing an alien to apply for admission to, or to be admitted to, the United States in order to apply for adjustment of status under this subsection.

8 U.S.C. § 1255a(a)(3)(C). According to the INS, this subsection clarifies that subsection

(B) cannot be used as an admission ticket to the United States. The INS reads this subsection far too broadly.

Subsection (C) only precludes admission into the United States *"in order to apply for adjustment of status."* 8 U.S.C. § 1255a(a)(3)(C) (emphasis added). Espinoza, however, had already applied for legalization, and thus was not seeking to enter the country *to apply* for legalization. Accordingly, by its plain terms, subsection (C) is inapplicable to Espinoza.

The INS also makes much of the fact that once a legalization applicant is granted temporary lawful status, Congress expressly authorized travel abroad.

> The Attorney General shall, in accordance with regulations, permit the alien to return to the United States after such brief and casual trips abroad as reflect an intention on the part of the alien to adjust to lawful permanent resident status ... and after brief temporary trips abroad occasioned by a family obligation involving an occurrence such as the illness or death of a close relative or other family need.

8 U.S.C. § 1255a(b)(3)(A). This section expressly applies to border-crossings. It also applies only to those aliens who have already received temporary lawful status. According to the INS, this section evinces Congress's ability to carve out special entry procedures for aliens subject to IRCA. Congress's failure to provide a similar section for legalization applicants suggests to the INS that Congress intended to deny legalization applicants border-crossing privileges. *See Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another ..., it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion").

■ A countervailing principle of statutory construction, however, undermines the INS's position. Section 1255a(a)(3)(B) does include the "brief, casual, and innocent" language of *Fleuti.* Historically, this language has been viewed as a border-crossing mechanism. *See Mendoza,* 16 F.3d at 337 (indicating the *Fleuti* doctrine is a mechanism to avoid the

entry doctrine). When Congress adopts language from case law into statutes, there is a strong presumption that Congress intended the language to have the same purpose in the statute, as it did in the common law. *CSS I,* 685 F.Supp. at 1154 (citing *Lorillard v. Pons,* 434 U.S. 575, 583, 98 S.Ct. 866, 871, 55 L.Ed.2d 40 (1978)). Accordingly, in this instance, the more explicit language of § 1255a(b) does not evince Congress's intent to limit the scope of § 1255a(a)(3)(B). As § 1255a(a)(3)(B) expressly includes the language of the *Fleuti* doctrine, we cannot, merely by reference to § 1255a(b), conclude that Congress did not intend § 1255a(a)(3)(B) to operate as a border-crossing mechanism.

Finally, the INS argues by analogy to 8 U.S.C. § 1160, a separate legalization framework for seasonal agricultural workers ("SAW"). Under § 1160(d)(2), SAW applicants cannot be excluded or deported during the pendency of their applications. By contrast, IRCA legalization applicants are only protected against deportation, not exclusion. *See* 8 U.S.C. § 1255a(e)(2) (providing that legalization applicant presenting prima facie application for lawful status "may not be deported"). The INS argues that the difference in the statutory schemes reflects Congress's intention to deny admission to IRCA legalization applicants stopped at the border.

We disagree. SAW has no bearing on whether Espinoza can reenter the United States after his trip to Guadalajara. SAW does not have a continuous physical presence requirement. Because SAW applicants are not required to prove continuous physical presence, there was no need for Congress to carve out a "brief, casual, and innocent" exception under SAW. Thus, SAW does not help us to determine the scope of § 1255a(a)(3)(B).

In sum, none of the arguments presented by the INS convinces us that Congress intended § 1255a(a)(3)(B) to apply only in the context of legalization decisions. By the same token, nothing in § 1255a expressly indicates that subsection (B) was intended to apply at the border. Accordingly, we conclude that Congress has not clearly and un-

ambiguously defined the scope of § 1255a(a)(3)(B).

## B. The INS's Interpretation of the Statute

As the statute itself does not define the scope of the *Fleuti* doctrine as applied to legalization applicants, we must look beyond the statute to find the answer. In so doing, we first turn to the INS's own construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

### 1. What is the INS's Construction?

The INS argues that § 1255a(a)(3)(B) is not intended to act as a border-crossing mechanism. In practice, however, the INS developed the advance parole regulations to monitor legalization applicants' departure from and readmission into this country. *See* 8 C.F.R. §§ 245a.2(m)(1) & (n)(2). From what source does the INS derive its authority to permit legalization applicants to cross and re-cross the border? It is, of course, § 1255a(a)(3)(B)'s "brief, casual, and innocent" language.

8 C.F.R. § 245a.2(*l*) provides guidance on § 1255a(a)(3)'s continuous physical presence requirement. Subsection (2) of that regulation provides in pertinent part: "A brief, casual and innocent absence *means a departure authorized by the Service (advance parole)."* 8 C.F.R. § 245a.2(*l*)(2) (emphasis added). This regulation unambiguously and clearly reveals that the INS interprets the "brief, casual, and innocent" language of § 1255a(a)(3)(B) as a border-crossing mechanism. The very existence of the contested regulation belies the INS's argument. Through the authority derived from subsection (B), the INS created admission procedures entitling legalization applicants to be readmitted to the country. Thus, contrary to its argument, the INS has construed subsection (B) as a border-crossing mechanism.

### 2. Is it Permissible?

We next must decide whether the INS's construction of the statute is permissible. That is, is it permissible to construe subsection (B) as a border-crossing mechanism? We conclude that it is.

The *Fleuti* doctrine itself is a border-crossing mechanism, whereby lawful resident aliens are not deemed to have entered the country if an absence was not intended meaningfully to disrupt permanent residency in the United States. 374 U.S. at 462, 83 S.Ct. at 1812. Given the historical function of the *Fleuti* doctrine, the INS was perfectly justified in concluding that Congress intended § 1255a(a)(3)(B) to extend to the border. *See Lorillard,* 434 U.S. at 583, 98 S.Ct. at 871–72 (presumption that Congress intends statutory phrases adopted from common law to have the same well-known meaning of common law).

Moreover, the legislative history confirms that Congress was well aware of the historical meaning of the *Fleuti* doctrine when it enacted § 1255a(a)(3)(B). *De Oliveira v. United States INS,* 873 F.Supp. 338, 343 (C.D.Cal.1994) (citing H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 116 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5720).[3] Accordingly, because the agency's construction of the statute conforms with congressional intent, we hold that the INS's construction of § 1255a(a)(3)(B) as a border-control mechanism is a permissible construction of the statute.

## IV. Do the Advance Parole Regulations Conflict with the Statute?

■ We must next determine whether the INS's regulations requiring legalization applicants to receive advance parole conflict with its own construction of § 1255a(a)(3)(B) as a border control mechanism. We conclude that the regulations requiring advance parole are invalid. *See CSS I,* 685 F.Supp. at 1159 (invalidating the regulations); *De Oliveira,* 873 F.Supp. at 343 (same); *Fernandes*

---

**3.** In a letter to the Chairman of the House Judiciary Committee, then Assistant Attorney General, John Bolton, discussed the *Fleuti* doctrine in his comments regarding use of the phrase "brief, casual, and innocent" in § 1255a(a)(3)(B). (H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 116 (1986), *reprinted in* 1986 U.S.C.C.A.N. at 5649, 5720).

*v. McElroy,* 920 F.Supp. 428 (S.D.N.Y.1996) (same).

Since the Supreme Court decided *Fleuti* in 1963, courts have found that a trip was "brief, casual, and innocent" if it was not intended to disrupt meaningfully an alien's permanent residency in the United States. *CSS I,* 685 F.Supp. at 1158 (citing *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812). The focal point of the *Fleuti* doctrine is the alien's intentions. *Fleuti,* 374 U.S. at 462, 83 S.Ct. at 1812. "[W]e declare today simply that an innocent, casual, and brief excursion by a resident alien … may not have been 'intended' as a departure disruptive of his resident alien status and therefore may not subject him to the consequences of an 'entry' into the country on his return." *Id.*

The INS's advance parole regulations totally lose sight of the *Fleuti* doctrine's purpose to circumvent entry procedures when aliens have not intended to disrupt their United States residency. Instead, the advance parole regulations require aliens to jump through several administrative hoops in order to receive advance parole. *See* 8 C.F.R. §§ 245a.2(*l*)(2), (m)(1) & (n)(2). Aliens who fail to jump through the requisite administrative hoops are thereafter barred from reentering the country, regardless of the fact that a departure may not have been intended to disrupt United States residency. *See* 8 C.F.R. § 245a.2(m)(1).

For example, in *De Oliveira,* the legalization applicant flew to Brazil after learning her mother was ill and needed surgery. 873 F.Supp. at 339–40. The petitioner waited in line for two days to obtain advance parole prior to her departure, but did not get in to see an INS agent. *Id.* The petitioner had to leave to be with her mother, and so left without permission from the INS. *Id.* The INS thereafter put her into exclusion proceedings upon her return. *Id.* In these circumstances, it is irrefutable that the petitioner did not intend to disrupt meaningfully her United States residency. Nonetheless,

the INS sought to exclude the petitioner by application of its advance parole regulations. Such a result cannot be reconciled with the intent and spirit of the *Fleuti* doctrine.

By construing the "brief, casual, and innocent" language of subsection (B) so narrowly, not only has the INS eviscerated the historical meaning and purpose of the words; it has also contravened Congress's intent that IRCA be liberally construed.

> The Committee intends that the legalization program should be implemented in a liberal and generous fashion, as has been the historical pattern with other forms of administrative relief granted by Congress.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 72 (1986), *reprinted in,* 1986 U.S.C.C.A.N. 5649, 5676. The advance parole regulations subjecting legalization applicants to administrative requirements not contemplated by the *Fleuti* doctrine are a far cry from a liberal and generous application of IRCA as intended by Congress.

Given the historical meaning of the phrase "brief, casual, and innocent," and given Congress's desire for IRCA to be liberally and generously construed, we conclude that subsection (B) is not limited to those absences authorized in advance by the INS. To the contrary, the language of the statute, as confirmed by the INS's own interpretation, mandates the application of the *Fleuti* doctrine as it has been historically understood and applied. We therefore hold those regulations requiring advance parole for legalization applicants to be invalid: 8 C.F.R. § 245a.2(*l*)(2), providing that a brief, casual, and innocent absence means a departure authorized by the INS; and 8 C.F.R. § 245a.2(m)(1) providing that readmission is authorized only if the alien received advance parole.[4] We therefore remand to the INS for a determination under *Fleuti* whether Espinoza's absence was "brief, casual, and innocent." *See Castrejon–Garcia v. INS,* 60 F.3d 1359, 1362–63 (9th Cir.1995) (construing "brief, casual, and innocent").

---

**4.** We do not invalidate 8 C.F.R. § 245a.2(n)(2)(i), which provides that the INS may grant advance parole to legalization applicants. Many legalization applicants may prefer to have advance permission from the INS knowing that there will not be any immigration concerns upon their return. We only invalidate those statutes that *require* advance parole, but we do not foreclose the *option* of advance parole.

## V. Jurisdiction to Review Denial of Legalization Appeal

■ Espinoza appeals the district court's determination that it lacked jurisdiction to review the merits of the LAU's denial of his legalization application appeal. Review of IRCA and its legislative history shows that Congress did not intend judicial review of legalization denials in exclusion proceedings.

8 U.S.C. § 1255a(f)(1) provides there "shall be no administrative or judicial review" of an IRCA application, except as expressly accorded by the statute. Section 1255a(f)(4) provides for judicial review of a denial of a legalization application "only" in "an order of deportation under section 1105a of this title." *Id.* (emphasis added); *see also Reno v. Catholic Social Serv., Inc.,* 509 U.S. 43, 53–54, 113 S.Ct. 2485, 2493–94, 125 L.Ed.2d 38 (1993); *Noriega–Sandoval v. INS,* 911 F.2d 258, 260–61 (9th Cir.1990). Thus, the plain meaning of the statute precludes review of a legalization application in an exclusion proceeding, such as the one at bench.

The plain meaning of a statute is controlling, "absent a clearly expressed congressional intention to the contrary." *Id.* at 260 (quoting *United States v. Hoffman,* 794 F.2d 1429, 1432 (9th Cir.1986)). The legislative history of § 1255a(f) indicates that Congress's failure to provide for judicial review of a legalization application in an exclusion hearing was intentional.

> When the administrative review is exhausted and also yields a negative decision, and when the applicant is in a deportation proceeding (but not an exclusion proceeding), the applicant can appeal a negative decision within the context of judicial review of a deportation order.

H.R.Rep. No. 682(I), 99th Cong., 2d Sess. 74 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5678 (emphasis added).

Moreover, in SAW, passed simultaneously with IRCA, Congress did provide for judicial review of LAU denials in exclusion proceedings. 8 U.S.C. § 1160(e)(3)(A). Section 1160(e)(3)(A), providing the exclusive means of judicial review of SAW legalization denials, is identical to § 1255a(f)(3)(A), with one major exception. Section 1160(e) expressly provides that orders of deportation and exclusion can be judicially reviewed, while § 1255a(f) provides for judicial review only of deportation orders.

The fact that Congress did not include judicial review in § 1255a(f) indicates that Congress did not want to give IRCA applicants this benefit. *See Russello,* 464 U.S. at 23, 104 S.Ct. at 300–01; *see also Navarro–Aispura v. INS,* 53 F.3d 233, 235 (9th Cir. 1995) (recognizing in the context of another amnesty statute, 8 U.S.C. § 1259, that there is no administrative review in exclusion proceedings).

In summary, the plain meaning of the statute, its legislative history, and its construction, all suggest that Congress purposely foreclosed the possibility of judicial review of an LAU denial in an exclusion proceeding.

Espinoza also argues that the district court had jurisdiction to review the LAU denial because the IJ ordered that Espinoza be "excluded and deported" from the United States. Section 1255a(f)(4)(A) provides: "There shall be judicial review of such a denial only in the judicial review of an order of deportation under section 1105a of this title." Thus, because he has been ordered to be deported, Espinoza claims that the plain language of § 1255a(f)(4)(A) gives the district court jurisdiction to review the denial. Espinoza's argument is without merit.

Although Espinoza relies on use of the word "deport" in the IJ's order, he was not subject to a deportation hearing, nor is he subject to an order of deportation. He was the subject of an exclusion proceeding. Consequently, he is subject to an order of exclusion, which can only be effectuated by deporting him. *See Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073–74, 2 L.Ed.2d 1246 (1958) (use of the word deportation in an exclusion proceeding is merely the method of removing the alien from this country, and is not intended as a word of art). Accordingly, we reject Espinoza's attempt to recharacterize his exclusion hearing as a deportation hearing within the meaning of § 1255a(f) and affirm the district court's holding that it lacked jurisdiction to review the LAU's denial of his legalization appeal.

## VI. Attorney's Fees

Espinoza requests attorney's fees on appeal under subsection (b) of the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(b). This subsection makes the United States liable to the prevailing party[5] for attorney's fees "to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." 28 U.S.C. § 2412(b).

Espinoza identifies no statute providing for an award of fees. Under the common law, attorney's fees may be assessed against a losing party that has "acted in bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *Chambers v. NASCO, Inc.,* 501 U.S. 32, 45–46, 111 S.Ct. 2123, 2133–34, 115 L.Ed.2d 27 (1991) (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y,* 421 U.S. 240, 258–59, 95 S.Ct. 1612, 1622, 44 L.Ed.2d 141 (1975)). The bad faith doctrine is an exception to the "American rule" that litigants bear their own expenses. *Barry v. Bowen,* 825 F.2d 1324, 1334 (9th Cir.1987). As the bad faith exception predates the EAJA, it is applicable in suits against the United States. *Id.* (citing H.R.Rep. No. 1418, 96th Cong., 2d Sess. 9, *reprinted in* 1980 U.S.C.C.A.N. 4953, 4984, 4987).

Awarding attorney's fees under this common law doctrine is punitive, and should be imposed "only in exceptional cases and for dominating reasons of justice." *Brown v. Sullivan,* 916 F.2d 492, 495 (9th Cir.1990) (internal quotations omitted). To be liable, the government's conduct must have been more than merely unreasonable. *Barry,* 825 F.2d at 1334. The burden of showing the government's bad faith is on the prevailing party. *Id.* at 1333. (citing *United States v. Ford,* 737 F.2d 1506, 1509–10 (9th Cir.1984)).

In sum, Espinoza has not offered any argument whatsoever to support his request for fees under § 2412(b). Thus, he has failed to meet his burden of showing the government's bad faith. Moreover, we have held that the government does not act in bad faith where it seeks judicial resolution of an important, doubtful question of law that is "not subject to resolution by clear, controlling precedent." *Minor v. United States,* 797 F.2d 738, 739 (9th Cir.1986) (internal quotation omitted). As the preceding analysis indicates, the issues presented in this appeal were difficult and the law unsettled. Accordingly, we conclude that the government did not act in "bad faith, vexatiously, wantonly, or for oppressive reasons[.]" *Chambers,* 501 U.S. at 45–46, 111 S.Ct. at 2133–34 (quoting *Alyeska,* 421 U.S. at 258–59, 95 S.Ct. at 1622). The request for attorney's fees is therefore denied.[6]

## CONCLUSION

Because we conclude that INS regulations requiring advance parole are invalid, we reverse the district court's holding denying the petition for writ of habeas corpus and remand for determination by the INS whether Espinoza's absence was "brief, casual, and innocent," under *Fleuti.* We affirm the district court's holding that it lacked jurisdiction to review the merits of the LAU's denial of his legalization appeal.

**REVERSED IN PART, AFFIRMED IN PART AND REMANDED.** Espinoza shall recover his costs on appeal.

---

5. Espinoza has prevailed on this appeal, at least in substantial part. We assume for purposes of analyzing his claim that he is the "prevailing party" under the EAJA. *See, e.g., Animal Lovers Volunteer Ass'n v. Carlucci,* 867 F.2d 1224, 1225 (9th Cir.1989) (to qualify as a prevailing party, the plaintiff must succeed on any significant issue).

6. Espinoza does not seek fees under the EAJA's more generous standard of subsection (d)(1)(B), which permits an award of fees if the position of

the United States was "not substantially justified." 28 U.S.C. § 2412(d)(1)(B). *See Barry,* 825 F.2d at 1334 (more difficult to establish "bad faith" under § 2412(b), than to establish "not substantially justified" under § 2412(d)). Because Espinoza did not seek fees under § 2412(d) in his initial brief, we cannot consider an award of fees under that subsection. Ninth Cir. R. 39–1.6; *see United States v. City and County of San Francisco,* 990 F.2d 1160, 1161 (9th Cir.1993).